559 A.2d 1002

**FRANKLIN COUNTY NURSING HOME, Petitioner,**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 25, 1988.

Re-argued Feb. 8, 1989.

Decided June 6, 1989.

Gerald Gornish, Jeffrey B. Schwartz and Steven E. Bernstein, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, for petitioner.

Bruce G. Baron, Asst. Counsel, Harrisburg, for respondent.

Before CRUMLISH, Jr., President Judge, and CRAIG, DOYLE, BARRY, COLINS, McGINLEY and SMITH, JJ.

SMITH, Judge.

Franklin County Nursing Home (Franklin) appeals from an order of the Executive Deputy Secretary of the Department of Public Welfare (DPW) denying Franklin reimbursement of costs under Pennsylvania's medical assistance program, Section 443.1 of the Public Welfare Code.[1] This Court reverses DPW.[2]

The issue before this Court is whether Section 201 of the General Appropriations Act of 1980 (Act)[3] required DPW to

---

**1.** Act of June 13, 1967, P.L. 31, *as amended,* added by Section 5 of the Act of July 31, 1968, P.L. 904, *as amended,* 62 P.S. § 443.1.

**2.** This Court previously issued its order dated September 16, 1988 affirming DPW's denial of reimbursement of costs to Franklin, —— Pa.Cmwlth. ——, 548 A.2d 333 (1988). Pursuant to Franklin's application for reargument and order of this Court, Franklin's appeal was reargued before the Court en banc on February 8, 1989.

**3.** Act of June 30, 1980, P.L. 1391.

reimburse Franklin for the period October 1, 1980 to June 30, 1981 at a rate not less than its immediately preceding rate, and whether the Act further required DPW to utilize Franklin's final audited rate in determining the rate of reimbursement as opposed to Franklin's interim rate for the period October 1, 1980 to June 30, 1981.

## I

Franklin is a county skilled nursing and intermediate care facility providing services to Medicaid patients pursuant to the medical assistance program. In Section 201 of the Act, signed into law on June 18, 1980, the General Assembly directed DPW to replace the existing statewide ceiling system of reimbursement rates for county nursing homes with a new group-based ceiling system which involved the calculation of separate reimbursement ceilings for county homes within each of the five standard metropolitan statistical areas (SMSA) in the Commonwealth. Section 201 further provided that no public nursing home would have a ceiling below its reimbursement rate in effect prior to implementation of the new ceilings and that a change in the method of reimbursement must receive prior approval by the United States Department of Health and Human Services (HHS).

On July 26, 1980, DPW published a notice in the Pennsylvania Bulletin (10 Pa.B. 3122) stating its intention to amend the current statewide ceilings in accordance with requirements of the Act. Subsequently, on September 30, 1980, DPW submitted a request to HHS for approval of a proposed amendment to the Pennsylvania State Plan for Medical Assistance (state plan) noting on the HHS transmittal form that such amendment was being sought to comply with Section 201 of the Act. HHS disapproved the request in a letter dated December 24, 1980 for reasons set forth in an attached memorandum which stated the following with reference to the "no loss" clause of the Act:

Additionally, we observe that the language in the Pennsylvania appropriations bill concerning the subject amend-

ment includes a 'no loss' clause for affected facilities. That is, the appropriations language provides that no public nursing home shall have a ceiling below its rate that was in effect prior to the imposition of the ceilings. The 'no loss' clause appears acceptable, but this provision should be included in the plan.

Although the state plan was approved by HHS in March of 1981,[4] the final plan did not include the "no loss" clause referred to in the Act, nor was this clause included in the subsequent DPW regulations which implemented the Act.[5]

After publication of DPW's proposed rules at 10 Pa.B. 4963–4973 (1980), but prior to approval of the state plan by HHS, Franklin wrote DPW to inquire about the proposed changes in reimbursement to county homes. DPW responded by letter dated January 29, 1981 that if a county home's SMSA ceiling is less than the reimbursement rate which the home received on December 30, 1980, reimbursement at the higher rate would continue.

The SMSA based ceilings became effective October 1, 1980 and Franklin was assigned to the non-SMSA Group III. The skilled nursing facility ceiling for Group III was $39.24 for the period October 1, 1980 through December 31, 1980 and the intermediate care facility ceiling for this period was $29.14. Franklin's final audited rates for this same three month period were $42.37 for skilled nursing facility and $29.23 for intermediate care facility.

DPW revised the county nursing home SMSA ceilings effective July 1, 1981, increasing the non-SMSA Group III skilled nursing facility ceiling by $9.11 per day and the intermediate care facility ceiling by $7.44 per day. For the first six months of 1981, however, the 1980 ceilings were still in effect. Franklin's final audited rates for January 1, 1981 through June 30, 1981 were $42.29 for skilled nursing facility and $31.65 for intermediate care facility.

4. The HHS letter of approval to DPW is dated March 17, 1981 and the state plan was effective July 1, 1980.

5. *See* 11 Pa.B. 2610–2620 (1981).

For both of these periods (October 1 through December 31, 1980 and January 1 through June 30, 1981), DPW determined that Franklin's final audited rates had been capped by the SMSA ceilings. The practical effect of this determination was that Franklin failed to recoup its actual costs for these periods as follows:

| Date | SMSA ceiling | Franklin final audit | Loss per Patient Day |
|------|--------------|----------------------|----------------------|
| Skilled Nursing Facility | | | |
| 10-1-80 to 12-31-80 | $39.24 | $42.37 | $2.05 |
| 1-1-81 to 6-30-81 | $39.24 | $42.29 | $3.05 |
| Intermediate Care Facility | | | |
| 10-1-80 to 12-31-80 | $29.14 | $29.23 | $ .09 |
| 1-1-81 to 6-30-81 | $29.14 | $31.65 | $2.51 |

Franklin appealed from DPW's 1980 audit report, and on January 20, 1983, the Office of Hearings and Appeals (OHA) adopted the hearing officer's recommendation that Franklin's reimbursement for the period October 1, 1980 through December 31, 1980 be increased to the level of its final audited rates. DPW petitioned for reconsideration of this order on February 4, 1983, and thereafter, Franklin appealed the 1981 audit report. Both appeals were consolidated. On May 9, 1985, the Executive Deputy Secretary entered an order reversing the OHA. Hence, Franklin's petition for review to this Court.[6]

## II

■ Franklin first contends that DPW's argument that the "no loss" clause of the Act is unenforceable, because it was not included in the final state plan approved by HHS and DPW regulations implementing the plan, constitutes a

6. This Court's scope of review is limited to determining whether DPW's adjudication is in accordance with applicable law, whether its findings are supported by substantial evidence, and whether any constitutional rights were violated. *Carbondale Nursing Home, Inc. v. Department of Public Welfare*, 120 Pa.Commonwealth Ct. 186, 548 A.2d 376 (1988).

deliberate defiance of the legislative mandate. Franklin notes that the Act clearly mandated that county nursing homes shall sustain no loss as a result of the implementation of the statewide ceilings. Franklin argues that despite DPW's failure to incorporate the "no loss" provision in the state plan or its regulations, this Court should find that the provision was approved by HHS by virtue of DPW's initial submission (September 30, 1980) which sought approval to comply with Section 201 of the Act; the HHS response to the initial submission that the "no loss" clause appeared to be acceptable; DPW's published notice of intent to amend the ceilings in accordance with the Act; and DPW's letter to Franklin (January 29, 1981) affirming that county nursing homes would continue to be reimbursed at the higher rate.

The Court is persuaded by Franklin's argument. Although DPW argues strenuously that it had no intent to adopt a "no loss" clause, this Court finds it telling that subsequent to DPW's publication of the notice of intent (July 25, 1980) and proposed rules (December 27, 1980) which failed to mention the "no loss" clause, DPW wrote to Franklin by letter of January 29, 1981 stating:

> The Appropriations Act *requires* the Department to reimburse county nursing facilities actual allowable costs subject to ceilings established by Standard Metropolitan Statistical Areas. Under this legislation, no county nursing home shall have a ceiling below the rate that was in effect as of December 31, 1980. Therefore, if the computed ceiling for a Standard Metropolitan Statistical Area is less than the reimbursement a facility received on December 31, 1980, the facility would continue to be reimbursed at the higher rate.

This action by DPW some four weeks after publication of the proposed rules is inconsistent with its argument that there was never any intention to implement the "no loss" provision of the Act. Clearly as late as January 29, 1981, DPW did intend to honor and implement this clause even though the language was not included in the proposed regulations. This Court need not speculate as to why this

language was not covered in the state plan or regulations; the representations of DPW to both HHS and Franklin make it clear that DPW intended to proceed in accordance with the Act.[7]

DPW next argues that Section 201 of the Act could not have mandated the agency to change the medical assistance program reimbursement system because of the prohibition of Article III, Section 11 of the Pennsylvania Constitution as to general appropriation bills:

The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.

This Court in *Biles v. Department of Public Welfare,* 44 Pa.Commonwealth Ct. 274, 277, 403 A.2d 1341, 1343 (1979) set forth the test to be applied in determining whether a rider to a general appropriations act is constitutional.

To be constitutional the language in an appropriation bill must be germane to the appropriations, must not conflict with existing law and it must not extend beyond the life of the appropriations bill itself. This test is a good one. Clearly, the case at bar passes it. The provision is germane. It is a limitation or directive on the manner of spending appropriated public assistance funds. It is not in conflict with existing statutes and it has not extended any further than the life of the appropriation itself: ...

This Court finds that the "no loss" clause of the Act satisfies all three requirements of *Biles.*

█ Having found that the "no loss" provision is to be given effect for the period October 1, 1980 to June 30, 1981, this Court must now determine whether the Act should be

7. *See Baltimore and Ohio Railway Co. v. Jackson,* 353 U.S. 325, 77 S.Ct. 842, 1 L.Ed.2d 862 (1957) and *United States v. E.I. DuPont de Nemours & Co.,* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957) wherein the Court held that it had a duty to interpret the intention of Congress when it made law and that failure of an agency to act is not a binding administrative interpretation that Congress did not intend a certain application of the law.

applied to the interim rate or the final audited rate. Insofar as the term "rate" is not defined by the Act, it is necessary for the Court to apply the rules of statutory construction found in Section 1921(c) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(c), which states that:

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

. . . .

(6) The consequences of the particular interpretation.

Interim rates are based on the latest annual adjusted reported costs and approved budgets and provide a county home with a steady cash flow for the fiscal year. At the end of the fiscal year, the provider's accounts are audited by the Auditor General and adjustments are made to the provider by DPW for over or under payments. DPW contends that the only rate in effect at the end of 1980 was the interim rate and therefore no other interpretation of the word is possible. The consequences of this interpretation, however, result in a financial loss to Franklin, a result which is inconsistent with the "no loss" clause of the Act. This Court thus finds that the only way to avoid violating the "no loss" provision is to interpret the meaning of "rate" as set forth in the Act as the final audited rate.

Finally, DPW argues that Franklin cannot be reimbursed for its final audited rates for the time period because the final rates exceed the SMSA ceilings and such reimbursement would not be in accordance with federal regulations resulting in a withholding of federal reimbursement to DPW for any amounts paid to Franklin in excess of the ceilings. As recognized by this Court in *Department of Public Welfare v. Town Court Nursing Centers, Inc.*, 97 Pa.Commonwealth Ct. 380, 509 A.2d 950 (1986), *appeal denied*, 515 Pa. 595, 528 A.2d 603 (1987) the issue of a provider's claim against DPW is separate and distinct from the availability of federal reimbursement to DPW. Therefore, this Court need not concern itself with this issue.

For the foregoing reasons, the order of the Executive Deputy Secretary of DPW dated May 9, 1985 is vacated and this case is remanded to DPW for further hearing to determine the reimbursement amounts owed to Franklin for the period October 1, 1980 through December 31, 1980 and January 1, 1981 through June 30, 1981 based upon Franklin's final audited rates for those periods.

## ORDER

AND NOW, this 6th day of June, 1989, the order of the Executive Deputy Secretary of the Department of Public Welfare is vacated and this case is remanded to the Department of Public Welfare for further hearing consistent with the opinion issued herein.

Jurisdiction relinquished.

McGINLEY, Judge, dissenting.

I respectfully dissent. The majority seeks to give effect to the General Assembly's intention that DPW promulgate regulations and procedures giving effect to the "no loss clause." The difficulty which presents itself is that the intent of the General Assembly as set forth in Section 201 of the Act is not limited to requiring DPW to give effect to the "no loss clause." The clear intent of the General Assembly was also to require DPW to obtain federal approval so as to permit the DPW to receive federal reimbursement. The first line of the provision contains the wording "in accordance with Federal regulations." In the last line of the provision, the General Assembly directs the Department to obtain federal approval prior to making the changes.[1] Thus, we must determine whether this Court

1. This intent is consistent with prior statutory authority concerning Pennsylvania's Medical Assistance Program:

    The following medical assistance payments shall be made in behalf of eligible persons whose institutional care is prescribed by physicians:

    . . . .

    (2) The cost of skilled nursing and intermediate nursing care in State-owned geriatric centers, institutions for the mentally retarded,

may order DPW to reimburse Franklin even though federal approval was not obtained and federal reimbursement would not be forthcoming. As enacted, Section 201 would appear to prohibit such a reimbursement to Franklin.

The majority opinion attempts to resolve this dilemma. I remain unconvinced. First, the majority relies on *Department of Public Welfare v. Town Court Nursing Center, Inc.*, 97 Pa.Commonwealth Ct. 380, 509 A.2d 950 (1986), for the holding that a provider's claim for reimbursement under its provider agreement is independent of the availability of federal reimbursement. I believe that the reliance on that case is misplaced. In *Town Court*, we did not address the issue concerning whether DPW may reimburse a provider when the authorizing legislation makes federal approval a prerequisite to any reimbursement, and such approval is lacking. Thus, *Town Court* does not resolve the current controversy.

Secondly, the majority is persuaded that the "no loss provision" was approved by HHS by virtue of DPW's initial submission and the HHS response thereto, in which HHS noted that the "no loss clause" appeared to be acceptable. Clearly, if HHS had approved the "no loss clause," there would be no dilemma. We could give effect to both provisions in Section 201, *i.e.*, that DPW promulgate regulations commensurate with the "no loss clause" and that federal approval be obtained. Unfortunately, this Court's holding that HHS approved the "no loss clause" is without support. The record establishes that the state plan did not include the "no loss clause" and it was never formally approved by

> institutions for the mentally ill, and in county homes which meet the State and *Federal requirements for participation under Title XIX of the Federal Social Security Act* and which are approved by the department. This cost in county homes shall be as specified by the regulations of the department adopted under *Title XIX of the Federal Social Security Act* and certified to the department by the Auditor General....

Section 443.1(2) of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. § 443.1(2).

HHS.[2]

Accordingly, because I read Section 201 of the Act as requiring federal approval, and because I view the record as indicating that such approval was not obtained, I believe that the payment to Franklin is improper.

---

**2.** HHS's response stated that although the "no loss" provision appeared to be acceptable, the clause had not been included in the state plan. (Official Record, Item No. 6, Exhibit A–3 at 6.)