The HOSPITAL & HEALTHSYSTEM ASSOCIATION OF PENNSYLVANIA, Crozer–Keystone Health System, Susquehanna Health System, and The Washington Hospital, Petitioners,

v.

The DEPARTMENT OF PUBLIC WELFARE, Commonwealth of Pennsylvania, and Feather Houstoun, In Her Capacity As Secretary of Public Welfare For the Commonwealth of Pennsylvania, Respondents.

Commonwealth Court of Pennsylvania.

Argued March 5, 2003.

Decided July 23, 2003.

Lewis R. Olshin, Philadelphia, for petitioners.

John A. Kane, Harrisburg, for respondents.

BEFORE: COLINS, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

■■■ Before the Court are the Department of Public Welfare's (DPW) and Feather O. Houstoun's (Secretary Houstoun)[1] (collectively DPW) preliminary objections to the Petition for Review in the Nature of a Complaint in Equity and Declaratory Judgment (Petition) filed by the Hospital & Healthsystem Association of Pennsylvania (HAP), Crozer–Keystone Health System, Susquehanna Health System, and the Washington Hospital (collectively Health Systems). HAP and the Health Systems seek to enjoin certain provisions of the Commonwealth's most recent General Appropriations Act as unconstitutional, claiming that the Act improperly effects a change in substantive law on the reimbursement to providers who treat Medical Assistance (MA) recipients. By its preliminary objections,[2] DPW seeks the dismissal of the Petition.

## HISTORY OF THE CASE

Petitioner, HAP, is a hospital trade association that represents more than 250

1. Estelle B. Richman was appointed to the position of Secretary of Public Welfare by Governor Edward G. Rendell on January 12, 2003. She was confirmed by the Senate on March 11, 2003.

2. In ruling upon a preliminary objection in the nature of a demurrer, we must accept as true all well-pleaded allegations of material fact and all inferences reasonably deductible therefrom. *Myers v. Ridge,* 712 A.2d 791, 794 (Pa.Cmwlth.1998). We need not accept as true conclusions of law, unwarranted inferences, argumentative allegations, or expressions of opinion. *Id.* The test is whether it is clear from all of the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish his or her right to relief. *Id.*

acute care hospitals throughout Pennsylvania. Petitioners, the Health Systems, are non-profit hospitals that provide medical services to MA recipients in southeastern Pennsylvania, northcentral Pennsylvania and southwestern Pennsylvania, respectively. They provide emergency services to all persons, including MA recipients, as required by the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, regardless of a patient's affiliation with a particular network or managed care organization (MCO). The Health Systems are members of HAP.

DPW is responsible for administrating the MA program in Pennsylvania. The program is comprised of two delivery systems: fee-for-service and managed care. Under the traditional fee-for-service system, health care providers enrolled in the MA program provide necessary medical services to eligible recipients and receive payment directly from DPW according to its established fee schedules. Under the managed care delivery system, called "Health Choices," DPW contracts with MCOs, which are private entities, to provide these services on a capitated basis. In turn, these MCOs reimburse providers, who render services to MCO members, in accordance with the contract between the provider and the MCO.

The General Appropriations Act of 2002 (the 2002 GAA) S.5, 186th Gen. Assem., Reg. Sess. (Pa.2002) appropriated funds for the 2002–2003 fiscal year necessary to operate state government. The appropriation to DPW contained a limitation; specifically, where the provider is not under contract with the MCO in which the MA recipient of its emergency services is en-rolled, the provider's reimbursement is capped at DPW's fee-for-service rate for that service.

Objecting to this limitation, HAP and the Health Systems filed their Petition together with an Application for Special Relief in the Nature of a Preliminary Injunction on October 29, 2002. The Petition asserts that the 2002 GAA was enacted in violation of the Pennsylvania and United States Constitutions. Because it will force hospitals to accept a default reimbursement rate, the 2002 GAA will violate the statute commonly known as the Quality Health Care Accountability and Protection Act (Act 68).[3] The request for preliminary injunctive relief was denied.[4]

DPW then filed preliminary objections to the Petition and a brief in support thereof, in which they argue the following: (1) HAP and the Health Systems lack standing to challenge the constitutionality of the disputed provision of the 2002 GAA; (2) the disputed provision can be read in pari materia with Act 68 and, therefore, does not affect a substantive change in existing law in violation of Article 3, Section 11 of the Pennsylvania Constitution; and (3) HAP and the Health Systems cannot evoke due process rights under the Pennsylvania and United States Constitutions to challenge legislative acts.

HAP and the Health Systems have responded to DPW with the arguments that: (1) they have standing to challenge the 2002 GAA because the Commonwealth has admitted that the challenged default reimbursement rate will reduce payments to hospitals by approximately $50 million during the 2002–2003 fiscal year; (2) the disputed provision is a rate-setting statute

3. Sections 2101–2193 of the Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, as amended, added by Section 1 of the Act of June 17, 1998, P.L. 464, 40 P.S. §§ 991.2101 991.2193.

4. This order was entered by the Honorable Warren G. Morgan, Visiting Senior Judge, on November 8, 2002.

that conflicts with Act 68 and, therefore, effects a change in substantive law in violation of the Pennsylvania Constitution; and (3) the "logrolling" of the disputed provision into the 2002 GAA, without prior notice or opportunity to comment, deprived HAP and the Health Systems of their right to negotiate reimbursement rates in violation of due process.[5] We will address the parties' arguments *seriatim*.

## STANDING

■ DPW argues that HAP and the Health Systems lack standing to maintain this action because the Petition "is devoid of any averments by the named hospitals or by the Association on behalf of its 250 members that any of them [were] harmed as a result of the disputed [provision] at any time since July 1, 2002." DPW's Brief at 6. Specifically, it contends that "Petitioners fail to allege even one instance since July 1, 2002, in which the named Petitioners or any one of the 250 Association members rendered emergency services to any one of the 980,000 HMO-enrolled [MA] recipients, billed the HMO, and was paid pursuant to the [disputed provision]." *Id.* at 8.

■ One who seeks to challenge governmental action must show an interest that is substantial, direct and immediate. *Ken R. on Behalf of C.R. v. Arthur Z.*, 546 Pa. 49, 53, 682 A.2d 1267, 1270 (1996); *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 202, 346

A.2d 269, 286 (1975). As our Supreme Court has explained:

> A "substantial" interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law. A "direct" interest requires a showing that the matter complained of caused harm to the party's interest. An "immediate" interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it and is shown where the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or constitutional guarantee in question.

*Ken R.*, 546 Pa. at 54, 682 A.2d at 1270. "Associations have standing to sue on behalf of their members if they allege that at least one of their members has or will suffer 'a direct, immediate and substantial injury' to an interest as a result of the challenged action." *Citizens for State Hospital v. Commonwealth*, 123 Pa. Cmwlth. 150, 553 A.2d 496, 498–499 (1989) (citing *Pennsylvania Gamefowl Breeders Association v. Commonwealth*, 533 A.2d 838, 840 (Pa.Cmwlth.1987)).

The interest that HAP and the Health Systems seek to protect here is the right of a hospital to negotiate with the MCO for payment for emergency services provided to MA recipients. They assert this right to negotiate under Section 2116 of Act 68, 40 P.S. § 991.2116.[6] Since DPW concedes that this interest is substantial for purposes of standing,[7] the only question is

---

**5.** The Urban Healthcare Coalition (Coalition) has filed an *amicus curiae* brief in support of HAP's and the Health Systems' response to the preliminary objections. The Coalition is a non-profit association comprised of hospitals that treat a disproportionately high percentage of MA and indigent patients.

**6.** Section 2116 guarantees MCOs "reasonably necessary costs." The reimbursement rate for emergency services is established in the

provider/MCO agreement for treatment of all members of the MCO. Here, Petitioners assert the right to negotiate an after-the-fact reimbursement rate for treating MA recipients that have failed to seek emergency services from a provider in their own MCO network.

**7.** *See* DPW's Brief at 8 n. 2. Indeed, since the Health Systems and the hundreds of other acute care hospitals represented by HAP provide emergency medical services to MA recip-

whether their interest is direct and immediate. For the reasons that follow, we find that it is.

HAP and the Health Systems aver that they provide emergency services to all MA recipients who present at their emergency rooms, as required by the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, regardless of the recipient's affiliation with a particular network or MCO. HAP and the Health Systems further aver that the disputed provision in the 2002 GAA deprives them of the reimbursement of reasonably necessary costs associated with those services. As of the effective date of the 2002 GAA, June 29, 2002, this deprivation was established.[8]

■ "Direct and immediate" have been explained by our Supreme Court. "Direct simply means that the person claiming to be aggrieved must show causation of the harm to his interest by the government's actions," and "[t]he immediacy or remoteness of the injury is determined by the nature of the causal connection." *DeFazio v. Civil Service Commission of Allegheny County*, 562 Pa. 431, 435, 756 A.2d 1103, 1105 (2000) (quotations omitted). Here, HAP and the Health Systems assert a double bind: they must, today, treat all MA patients but they cannot negotiate for the reimbursement for those services, at least for those patients not in an MCO with which the hospital has contracted. This interference establishes the requisite causal connection required for standing.

To hold otherwise, merely because HAP and the Health Systems failed to allege specific instances where they were paid pursuant to the disputed provision, would

effectively preclude them from ever bringing this litigation. By the time the services were provided and the claim was submitted, paid and disputed by the out-of-network provider, the 2002 GAA is likely to have expired. The averments in the Petition, taken together, establish that the interests of HAP and the Health Systems are direct and immediate for purposes of standing. Accordingly, the first preliminary objection is overruled.

## ARTICLE 3, SECTION 11 OF THE PENNSYLVANIA CONSTITUTION

DPW argues that HAP and the Health Systems have failed to state a claim upon which relief can be granted because the disputed provision "is no more than a directive on the manner of spending [MA] funds during the course of the fiscal year in certain circumstances when health care providers render emergency medical services to [MA] recipients." DPW's Brief at 6. HAP and the Health Systems counter that this provision does more than direct spending; it effects a change in existing substantive law on provider reimbursement for treatment of MA enrollees, which is anathema to our Pennsylvania Constitution.

■ The Pennsylvania Constitution provides as follows:

The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.

ients throughout Pennsylvania, regardless of a recipient's affiliation with a particular network or MCO, they have an interest in the subject matter of this litigation which surpass-

es the common abstract interest of the public at large.

8. DPW concedes that the 2002 GAA is self-executing and was immediately effective.

PA. CONST. art. III, § 11. Article III, Section 11, is one of several provisions in the Pennsylvania Constitution that details the appropriation powers of the General Assembly.[9] Its purpose is to prohibit the enactment of substantive legislation by means of a general appropriations act.[10] But for this prohibition, the general appropriations act could become an omnibus bill of the sort prohibited by the single subject rule in Article III, Section 3 of the Constitution.[11]

 Strictly interpreted, Article III, Section 11 mandates a general appropriation bill that is nothing more than a bare schedule of amounts appropriated and the objects of the expenditures. However, Pennsylvania courts have not applied the Article III, Section 11 mandate in such a literal fashion.[12] The leading case remains

**9.** *See, e.g.,* Article III, Section 27 (prohibits increasing the salary of a public officer after his election or appointment); Article III, Section 29 (prohibits appropriating funds to private persons for benevolent purposes); Article III, Section 30 (prohibits appropriating funds to a charitable institution not under the absolute control of the Commonwealth).

**10.** As has been noted by the Supreme Court of Washington:

An appropriation bill is not a law, in its ordinary sense. It is not a rule of action. It has no moral or divine sanction. It defines no rights and punishes no wrongs. It is purely lex scripta. It is a means only to the enforcement of law, the maintenance of good order, and the life of the state government.

*State v. Clausen,* 85 Wash. 260, 148 P. 28, 32 (1915).

**11.** It states:

No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

PA. CONST. art. III, § 3. Article III, Section 3 limits a bill to one subject in order to eliminate the harms occasioned by the omnibus bill, chief among them is "logrolling"—the practice of several minorities combining several, different proposals into one bill to obtain a majority vote, which could not have been realized by any of the single proposals. Article III, Section 3 expressly exempts general appropriation bills from its mandate lest the General Assembly be forced to pass hundreds of bills to enact a budget.

Indeed, a general appropriations bill, necessary to state government, is particularly vulnerable to transformation into an omnibus bill. Its sheer bulk allows a rider to escape the attention that would otherwise result in the rider's deletion by amendment. If the rider is attached by a conference committee, neither house can remove the rider by majority vote but must accept or reject the entire bill. A rider would have to be very offensive in order for a house to reject the entire bill because it disapproves a rider. Those in the legislative and in the executive branches will be loathe to bring the wheels of government to a halt for want of funds. *See Commonwealth ex rel. Attorney General, to Use of School District of Patton v. Barnett,* 199 Pa. 161, 172–173, 48 A. 976, 977 (1901).

**12.** This is the case in other jurisdictions as well. *See, e.g., State ex rel. Whittier v. Safford,* 28 N.M. 531, 214 P. 759 (1923) (wherein the court held that details such as the *per diem* travel expenditures allowed state officials was a "detail" properly included in a general appropriations act); *Lewis v. State,* 352 Mich. 422, 90 N.W.2d 856 (1958) (wherein the court held that reducing the retirement pay of an officer of the Michigan National Guard by amounts received from the U.S. government was found not to add a second object to an appropriation of state funds); *Schuyler v. South Mall Constructors,* 32 A.D.2d 454, 303 N.Y.S.2d 901 (N.Y.App.Div.1969) (wherein the court held that authorizing the Commisioner of General Services to negotiate a contract for the construction of a state library and museum was not "general legislation" and, thus, could be included in the appropriations act).

This is not to say that challenges to an appropriations act for violating a constitutional provision similar to Pennsylvania's Article III, Section 11, cannot succeed. *See, e.g., State ex rel. Washington Toll Bridge Authority v. Yelle,* 54 Wash.2d 545, 342 P.2d 588 (1959)

*Commonwealth ex rel. Greene v. Gregg,* 161 Pa. 582, 29 A. 297 (1894), in which our Supreme Court considered a provision in an appropriations act that authorized employment of à clerk in the office of the Supreme Court prothonotary and appropriated funds therefor. The Court upheld the provision, holding that the language in question was simply incidental to the main purpose of the appropriations act, which is "to secure the performance of the regular and ordinary work of the office." *Id.* at 588, 29 A. at 298. The Court offered a learned exposition of the good government purposes of Article III, Section 11,[13] concluding that it "cannot be assumed that the constitution meant to compel the legislature even to supervise all the details of the government," which would be the logical consequence if a separate enactment was required[14] "every time an additional clerk was to be appointed in a public department." *Id.* at 587–588, 29 A. at 298. In short, including incidental language in an appropriations act has long been understood to be constitutional.[15]

The task,[16] then, is to separate incidental language, which is permissible in an appropriations act, from substantive language, which is not. In *Biles v. Department of Public Welfare,* 44 Pa.Cmwlth. 274, 403 A.2d 1341 (1979), this Court announced a test for discerning the conditions that are proper in a schedule of expenditures from those that are offending. Adopting a test suggested by the Attorney General, this Court held that:

> [t]o be constitutional the language in an appropriation bill must be germane to the appropriations, must not conflict with existing law and it must not extend beyond the life of the appropriations bill itself.

*Id.* at 1343. We apply the *Biles* test here.

The disputed provision in the 2002 GAA states, in pertinent part, as follows:

> For medical assistance payments capitation plans.... Whenever medical assistance recipients enrolled in the Department of Public Welfare's prepaid capitation program receive medically necessary emergency services, includ-

---

(wherein the court held that language purporting to impose taxes as needed to satisfy toll bridge bonds violated the constitutional prohibition and was not a mere "qualification" permissible in an appropriations act); *Caldwell v. Board of Regents of University of Arizona,* 54 Ariz. 404, 96 P.2d 401 (1939) (wherein the court held that prohibiting the state's employment of both husband and wife established general qualifications for state employment and not merely incidental to a general appropriations act).

13. It was then Article III, § 15.

14. Our Supreme Court noted, in some detail, the separation of powers issues raised by Article III, Section 11. Not permitting incidental language, such as the funding of a clerk's position, would grant the legislative branch the ability to micromanage the day-to-day operations of the other two branches. At the other extreme is the "mischief" of the omni-

bus bill that undermines the democratic enactment of general legislation.

15. At least three official opinions of the Pennsylvania Attorney General have endorsed this view of Article III, Section 11. Pa. Op. Att'y Gen. No. 59 (1958), Pa. Op. Att'y Gen. No. 12 (1957), 1905–1906 Pa. Op. Att'y Gen. 356 (1905). In appropriate cases the Attorney General has recommended a veto of language found to be substantive not incidental. *See, e.g.,* Pa. Op. Att'y Gen. No. 81 (1933).

16. The task is not an easy one. As noted by the Supreme Court of Louisiana, legislatures artfully draft [] general law measures so that they appear to be true conditions or limitations on an item of appropriation.... *Conditions and limitations properly included in an appropriation bill must exhibit such a connexity with money items of appropriation that they logically belong in a schedule of expenditures.*

ing, but not limited to, emergency transportation services and poststabilization inpatient hospital services, *provided by noncontracting service providers,* such services shall be paid for by the contractor *at the payment rates adopted by the department for equivalent services provided under the department's fee-for-service program.*

2002 GAA at 123–124 (emphasis added). HAP and the Health Systems claim that this provision conflicts with Section 2116 of Act 68, which obligates an MCO to

> pay *all reasonably necessary costs* associated with the emergency services provided during the period of the emergency.

Section 2116 of Act 68, 40 P.S. § 991.2116 (emphasis added). Petitioners contend that Act 68 has conferred upon them a substantive right to negotiate with all MCOs, including those involved in Health Choices, for their "reasonably necessary costs" on a case-by-case basis. Relying upon *Constitution Defense League v. Waters,* 309 Pa. 545, 164 A. 613 (1933), *amicus curiae,* the Coalition, contends that the disputed provision is a rate-setting statute and, therefore, a substantive law.[17]

DPW responds that the disputed provision of the 2002 GAA does not conflict with Act 68. Rather, Section 2116 of Act 68 can be read in harmony with the disputed provision of the 2002 GAA as follows: a provider has received reimbursement for its "reasonably necessary costs" if it is reimbursed in accordance with DPW's fee-for-service fee schedule. Indeed, DPW argues that the disputed provision in the 2002 GAA illuminates the General Assembly's meaning in Act 68 that hospitals receive "reasonably necessary costs."[18] A hospital will be reimbursed at the same rate whether the emergency services are rendered to an MA recipient enrolled in a fee-for-service delivery system or enrolled in an MCO, but one that has not contracted with the hospital. Lastly, DPW notes that its interpretation is consistent with the Public Welfare Code, which limits payments to MA providers to those established by DPW. *See* Section 1406 of the Act of June 13, 1967, P.L. 31, *as amended,* added by Section 3 of the Act of July 10, 1980, P.L. 493, 62 P.S. § 1406. We agree with DPW's analysis.

First, the disputed provision is *not* a substantive rate law. Rate-setting statutes that govern private conduct are quite different from the disputed provision.

---

*Henry v. Edwards,* 346 So.2d 153, 158 (La. 1977) (emphasis added).

**17.** The Coalition argues that the disputed provision legislates what one private party, the MCO, will pay to another private party, the hospital. This makes it substantive, not appropriational, in nature. These are good points, but, on balance, they do not require the conclusion desired by *amicus* because the ultimate source of funding is the Commonwealth.

**18.** The constitutional challenge of HAP and the Health Systems focuses entirely on the contention that Act 68 and the disputed provision of the 2002 GAA conflict. They direct this Court's attention to our holdings in *Wesbury United Methodist Community v. Depart-*

*ment of Public Welfare,* 142 Pa.Cmwlth. 353, 597 A.2d 271 (1991) and *Cedarbrook Nursing Homes v. Department of Public Welfare,* 154 Pa.Cmwlth. 1, 622 A.2d 401 (1991). In those cases, the Court found it impossible to reconcile the language of the appropriations act with language in the Public Welfare Code, which established a date of implementation for a rate change. Here, we find no such conflict. Act 68 requires reimbursement of reasonable costs; the fee-for-service schedule of rates meets that standard. *See Hahnemann University v. Department of Public Welfare,* 128 Pa.Cmwlth. 605, 564 A.2d 521, 522 (1989) (wherein it was held that reasonable costs for treating MA recipients are those "specified in the Department's regulation"). HAP and the Health Systems claim *Hahne-*

They establish factors that must be considered by the rate-setting entity as well as statutory standards for the rate. *See, e.g.,* Casualty and Surety Rate Regulatory Act, Act of June 11, 1947, P.L. 538, *as amended,* 40 P.S. §§ 1181–1194;[19] Chapter 13 of the Public Utility Code, 66 Pa.C.S. §§ 1301–1328.[20] By contrast, the disputed provision of the 2002 GAA limits the amount that DPW can pay for emergency services to MA recipients.

Second, the *Waters* holding, cited by *amicus,* is inapposite. In that case, the issue was whether an appropriation to the then "Department of Welfare" for payment to 170 hospitals for services rendered to the indigent violated the single subject rule because of the number of hospitals involved. Notably, our Supreme Court agreed that language setting a maximum *per diem* was an appropriation, not substantive law. On the single subject issue, it held that the subject of the appropriations act was "not multiplied by the number of hospitals named as possible beneficiaries." *Id.* at 548, 164 A. at 614.

▆ Inherent in the power of appropriation is the power to specify how the money shall be spent. Accordingly, a general appropriations act may include qualifications, limitations, conditions and restrictions on the expenditure of funds. The

disputed provision of 2002 GAA is not about rate-setting between private parties. Rather, it limits the amount of public funds that DPW can use to pay its MCOs under contract to deliver services to its MA members. This is a qualification to the 2002 appropriation, not unlike the qualification in *Waters* held to be appropriational in nature.[21] Absent this qualification, DPW would be forced to compensate its contracting MCOs at ever higher levels to allow them to meet the provider demands.[22]

Finally, the conflict argument also fails. The disputed provision means that hospitals will receive the same payment for providing emergency services to MA patients not covered by an MCO provider agreement either because they are covered under the fee-for-service delivery system or because they have gone outside their own MCO network. We agree with DPW that Act 68 and the disputed provision of the 2002 GAA can, and must, be read together. *Fumo v. Hafer,* 155 Pa.Cmwlth. 520, 625 A.2d 733 (1993) (wherein we held that statutes should be construed together even where one of the statutes is a general appropriations act). DPW must pay for the "reasonably necessary costs" of inpatient care, and those costs are specified in DPW's fee-for-service schedule. *Hahnemann,* 564 A.2d at 522.

mann is not instructive here because it predates Act 68. We disagree.

19. The legislature requires the Insurance Department to give due consideration to past and prospective loss experience, expenses and a reasonable profit to the end that rates not be excessive, inadequate or unfairly discriminatory. Section 3 of the Casualty and Surety Rate Regulatory Act, 40 P.S. § 1183.

20. The Public Utility Commission regulates utility rates to the end that they are just and reasonable (66 Pa.C.S. § 1301) without imposing an unreasonable prejudice or preference upon customers (66 Pa.C.S. § 1304).

Utilities are permitted to charge a rate sufficient to give them a return on their capital (66 Pa.C.S. § 1311).

21. There was a question, however, whether the appropriation was general or special. *Waters,* 309 Pa. at 549, 164 A. at 614.

22. Indeed, the $50 million savings noted by HAP and the Health Systems supports DPW's position that the disputed provision in the 2002 GAA is not substantive but appropriations language. It restricts the amount that DPW can spend directly in the fee-for-service delivery system or indirectly in its MCO delivery system.

The disputed provision of the 2002 GAA passes the three-part *Biles* test. There is no conflict between Act 68 and the disputed provision of the 2002 GAA;[23] the spending limit expressed in the disputed provision is germane to appropriations; and the spending limit expires at the end of this fiscal year. The disputed provision limits the amount DPW can spend for emergency services rendered to MA recipients that seek treatment from an out-of-network provider; logically, this limit belongs in a schedule of expenditures. Accordingly, the second preliminary objection is sustained.

## DUE PROCESS

 Finally, DPW contends that HAP and the Health Systems have failed to state a claim upon which relief can be granted because the disputed provision does not violate the procedural due process guarantees of either the Pennsylvania[24] or the United States Constitution. Specifically, DPW argues that: (1) those guarantees do not apply to legislative actions; (2) HAP and the Health Systems do not allege that DPW and Secretary Houstoun have taken any action to implement the disputed provision; and (3) HAP and the Health Systems do not have a property interest in the statutory processes on which they premise their due process claim. We agree.

The United States Supreme Court decided long ago that the protections of procedural due process do not extend to legislative actions. *Bi–Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 60 L.Ed. 372 (1915). In *Bi–Metallic*, the Court rejected a landowner's contention that he had a due process right to a hearing before the State Board of Equalization voted on an order increasing the valuation of all taxable property in Denver, Colorado by forty percent. The Court stated:

> Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.

**23.** Judge Smith–Ribner, in her concurring and dissenting opinion, contends that "[i]f the Majority had accepted as true, as it must, Petitioners' well-pleaded facts and all reasonable inferences deductible from those facts, it properly should have concluded that the facts pleaded are legally sufficient to allow this case to go forward." However, the contentions summarized in the Petition are more properly described as conclusions of law and argumentative allegations than as "facts."

**24.** As noted by DPW, the due process guarantees in the Pennsylvania Constitution emanate from several provisions. The section most pertinent to the claim asserted here is Article I, Section 1, which provides in part:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

PA. CONST. art. I, § 1. The Pennsylvania Supreme Court has held that the same analysis governs the state and federal due process provisions, since the requirements of the state constitutional guarantee are indistinguishable from those of the 14th Amendment. *See Pennsylvania Game Commission v. Marich*, 542 Pa. 226, 229 n. 6, 666 A.2d 253, 255 n. 6 (1995).

*Id.; See also Rogin v. Bensalem Township,* 616 F.2d 680, 693 (3d Cir.1980) (passing of zoning amendments by township's board of supervisors did not deny developer procedural due process where, in passing the amendments, the board was acting in a legislative capacity). As recently as 1998, the Pennsylvania Supreme Court has reiterated this principle. *See Small v. Horn,* 554 Pa. 600, 613, 722 A.2d 664, 671 (1998) ("It is well settled that procedural due process concerns are implicated only by adjudications, not by state actions that are legislative in character.").

Since HAP and the Health Systems are challenging the propriety of legislative, rather than administrative action, their procedural due process claim must be rejected.[25] Accordingly, the third preliminary objection is sustained.

### CONCLUSION

 Any doubts concerning the constitutionality of legislation are to be resolved in favor of a finding of constitutionality. *Pa. Liquor Control Board v. Spa Athletic Club,* 506 Pa. 364, 370, 485 A.2d 732, 735 (1984). Here we consider an appropriations act passed by the legislature and signed by the governor;[26] we have the view of the two co-ordinate branches of government, and "they are entitled to respectful consideration and persuasive force, if the matter be at all in doubt." *Commonwealth ex rel. Greene,* 161 Pa. at 587, 29 A. at 298. We hold that the disputed provision of the 2002 GAA satisfies Article III, Section 11 of the Pennsylvania Constitution and that the procedural due process rights under the Pennsylvania and United States Constitutions cannot be invoked in this circumstance. Accordingly, we sustain DPW's preliminary objections, except as to its challenge to the standing of HAP and the Health Systems.

### ORDER

AND NOW, this 23rd day of July, 2003, the petition for review in the above-captioned matter is hereby dismissed. The preliminary objections are sustained in part and overruled in part consistent with the attached opinion.

Judge LEADBETTER did not participate in the decision · in this case.

### CONCURRING AND DISSENTING OPINION BY Judge SMITH–RIBNER.

I concur with the Majority's decision to overrule the first preliminary objection of the Department of Public Welfare (DPW) and Secretary Feather O. Houstoun (hereafter Respondents) as to Petitioners' standing to bring their action. I respectfully dissent, however, from the Majority's decision to sustain Respondents' remaining preliminary objections in the nature of a demurrer to the claims raised in Petitioners' petition for review.

Petitioners have averred that the disputed language of the General Appropria-

---

**25.** Having disposed of HAP's and the Health Systems' due process claim on this ground, we need not address whether DPW and Secretary Houstoun have taken any action to implement the disputed provision or whether HAP and the Health Systems have a property interest in the statutory processes on which they premise their due process claim.

**26.** The Pennsylvania Constitution gives the governor the power "to disapprove of any item of any bill, making appropriations of money ... and the item or items of appropriation disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of other bills over the Executive veto." PA. CONST. ART. iv, § 16. The governor did not exercise this veto with respect to the disputed provision of the 2002 GAA.

tion Act of 2002, Act of June 29, 2002, P.L. ——, No. 7A (2002 GAA), contains substantive language which directs DPW to reimburse Petitioners at a default reimbursement rate set at DPW's fee-for-service rate for Petitioners' provision of medical emergency services to medical assistance managed care organization (MCO) enrollees and that this default rate setting violates Article III, Section 11 of the Pennsylvania Constitution. Petitioners further aver that the legislature's default rate setting violates their due process rights. The ultimate question before the Court is whether the 2002 GAA contains substantive language which violates the Article III, Section 11 mandate that a "general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools."

The disputed language included in the 2002 GAA, which Petitioners challenge, reads as follows:

> Whenever medical assistance recipients enrolled in the Department of Public Welfare's prepaid capitation program receive medically necessary emergency services, including, but not limited to, emergency transportation services and poststabilization inpatient hospital services, provided by noncontracting service providers, such service shall be paid for by the contractor at the payment rates adopted by the department for equivalent services provided under the department's fee-for-service program.

Petitioners assert that the default reimbursement rate established by the disputed language violates the prohibition that this Court announced in *Common Cause of Pennsylvania v. Commonwealth,* 668 A.2d 190 (Pa.Cmwlth.1995), *aff'd,* 544 Pa. 512,

677 A.2d 1206 (1996), and furthermore that without any opportunity for notice and comment the legislative "logrolling" of a default rate deprived Petitioners of their substantive rights to receive all reasonably necessary costs for their provision of necessary medical emergency services guaranteed to them under the Act commonly known as the Quality Healthcare Accountability and Protection Act,[1] 40 P.S. §§ 991.2101–991.2193 (Act 68).

Respondents have demurred on the basis that Petitioners failed to state a claim on which relief may be granted inasmuch as the disputed language is "within the zone of lawful legislative direction accompanying an appropriation of funds" and does not violate Article III, Section 11 and further that the disputed language does not violate Petitioners' due process rights. The Majority agreed, holding that the disputed language is not substantive language in violation of Article III, Section 11 and, moreover, that it does not conflict with Act 68, and that when any doubts exist as to the constitutionality of a particular piece of legislation those doubts must be resolved in favor of a finding of its constitutionality. In my view, the Majority's ruling fails to comport with the well-settled standard that must be followed when ruling on preliminary objections.

Cases have repeatedly held that when ruling on preliminary objections in the nature of a demurrer the Court must accept and consider as true all well-pleaded facts in the petition for review and all reasonable inferences which might be deduced from those facts, and the Court must then decide whether the facts pleaded are legally sufficient to permit the case to proceed further. *Allegheny Sportsmen's League v. Ridge,* 790 A.2d 350 (Pa.Cmwlth.2002).

---

1. Sections 2101–2193 of The Insurance Company Law of 1921, Act of May 17, 1921, P.L.

682, *as amended,* added by Section 1 of the Act of June 17, 1998, P.L. 464.

When the facts pleaded state a claim for relief, the Court may not sustain the demurrer, *Willet v. Pennsylvania Medical Catastrophe Loss Fund,* 549 Pa. 613, 702 A.2d 850 (1997), and any doubts must be resolved in favor of refusing to sustain the demurrer. *Baravordeh v. Borough Council of Prospect Park,* 706 A.2d 362 (Pa. Cmwlth.1998). A careful review of the averments of Petitioners' petition for review shows unquestionably that this case is not clear and free from doubt and that the law does not state with certainty that no relief or remedy may be granted under the facts pleaded. *Pennsylvania AFL–CIO ex rel. George v. Commonwealth,* 563 Pa. 108, 757 A.2d 917 (2000).

Petitioners have averred, inter alia, (1) that the activities of the MCOs under contract with DPW are governed by Act 68, which delegates oversight authority to the Department of Health and to the Insurance Department (40 P.S. § 991.2181); (2) that Petitioners have not entered into contracts with a particular HealthChoices MCO and therefore are considered as out-of-network or non-plan providers; (3) that Act 68 provides that when an MCO enrollee receives necessary emergency services the managed care plan shall pay all reasonably necessary costs associated with the emergency services provided during the period of the emergency (40 P.S. § 991.2116; 31 Pa.Code § 154.14); and (4) that applicable regulations of the Department of Health and Insurance Department rejected the creation of a default rate for out-of-network or non-plan providers.

Petitioners further averred (1) that the default language in the 2002 GAA deprives them of reimbursement for reasonably necessary costs associated with the provided out-of-network emergency services; (2) that under the 2002 GAA those hospital providers who elected not to enter into contracts with a HealthChoices MCO will be required to accept DPW's fee-for-service reimbursement rates rather than obtain reasonable negotiated reimbursement rates from the MCOs under Act 68; (3) that the disputed language is substantive and essential to the medical assistance program as it establishes how emergency services must be reimbursed, and therefore it exceeds legislative authority under a general appropriation act and conflicts with existing law; (4) that Act 68 controls the payment by MCOs for emergency services; (5) that the legislative attempt to set emergency services reimbursement rates for non-contracting hospitals exceeds monetary appropriation and thus violates Article III, Section 11; (6) that the 2002 GAA appropriates money to private entities (MCOs) either directly or through DPW; (7) that DPW has no authority under Act 68 to require out-of-network or non-plan providers to accept medical assistance program reimbursement rates; and (8) that state law permits out-of-network or non-plan providers to contract with the MCO for reasonable reimbursement. 40 P.S. § 991.2116; 31 Pa.Code § 154.14.

Petitioners contend that the disputed language in the 2002 GAA fails to meet the test enunciated in *Biles v. Department of Public Welfare,* 44 Pa.Cmwlth. 274, 403 A.2d 1341 (1979), which held, inter alia, that appropriation act language in conflict with existing law constitutes substantive language and is in violation of the Article III, Section 11 requirements.[2] Petitioners further submit that because the default

---

**2.** *Compare Franklin County Nursing Home v. Department of Public Welfare,* 126 Pa.Cmwlth. 375, 559 A.2d 1002 (1989) (court found no violation of Article III, Section 11 when language in appropriation act was germane, did not conflict with existing law or exceed life of appropriation bill, and, moreover, it did not involve reimbursement rates to private entities).

rate conflicts with Act 68 emergency services reimbursement requirements, the default rate therefore conflicts with existing law and, as a consequence, represents substantive language in the 2002 GAA. Petitioners posit that Respondents' argument to the contrary is based on their contention that the 2002 GAA can be read in pari materia with Act 68 and that in making this argument they have ignored the exception contained therein that the act shall not apply to DPW's fee-for-service programs. Under principles of statutory construction, Petitioners assert, the Court cannot fairly read the 2002 GAA and Act 68 together because of this conflict. *See Fumo v. Hafer*, 155 Pa.Cmwlth. 520, 625 A.2d 733 (1993) (courts must consider plain and unambiguous meaning of statutes).

In *Common Cause* this Court cited *Cedarbrook Nursing Homes v. Department of Public Welfare*, 154 Pa.Cmwlth. 1, 622 A.2d 401 (1991), *aff'd*, 533 Pa. 307, 622 A.2d 282 (1993), for the holding that Article III, Section 11 prohibits the legislature from inserting substantive language in a general appropriation act, *i.e.*, language which goes beyond a monetary appropriation. In *Cedarbrook* the Court cited *Wesbury United Methodist Community v. Department of Public Welfare*, 142 Pa. Cmwlth. 353, 597 A.2d 271 (1991), *aff'd*, 533 Pa. 85, 619 A.2d 1057 (1993), in which the Court held that when the legislature has delegated rate-establishing authority, the legislature's attempt in a general appropriation act to create a new start date for a rate change went beyond "monetary appropriation" and consequently violated the proscription in Article III, Section 11 that a general appropriation bill shall embrace nothing but appropriations. More precisely, however, the Court in *Common Cause* held that the legislature may not lawfully "authorize, designate, allot or set aside monies, either directly or indirectly earmarked for specific entities not under

the absolute control of the Commonwealth." 668 A.2d at 205. It indicated that the legislative branch may not micromanage the executive's power to administer an appropriation by earmarking non-governmental recipients of the appropriation. Petitioners maintain here that the disputed language in the 2002 GAA falls within the *Common Cause* prohibition because the language establishes a reimbursement rate to be paid by private MCOs to private out-of-network hospitals for their services and that these private entities are not under the "absolute control" of the Commonwealth.

In response, the Majority merely states that the points raised in this connection are good ones but that "on balance" they do not dissuade the Majority from dismissing the action. Citing *Hahnemann University v. Department of Public Welfare*, 128 Pa.Cmwlth. 605, 564 A.2d 521 (1989), as support, the Majority additionally finds that DPW's fee-for-service schedule of rates satisfies the reimbursement-of-reasonable-costs standard, irrespective of the express exclusion of such rates from Act 68's coverage or the fact that *Hahnemann* predated Act 68. Furthermore, *Hahnemann* involved DPW reimbursement rates for in-patient services, a totally distinct category of health care services, which were based on concept scores of an efficient and economically operated hospital and included score factors such as the hospital's teaching status, its medical assistance volume, its environmental characteristics and hospital costs. The issues and circumstances in *Hahnemann* make it completely distinguishable from the matter at hand.

If the Majority had accepted as true, as it must, Petitioners' well-pleaded facts and all reasonable inferences deducible from those facts, it properly should have concluded that the facts pleaded are legally

sufficient to allow this case to go forward. Under the circumstances, the question presented in this case cannot be fairly resolved on demurrer. Additionally, a close review of the facts pleaded and current case law indicates that the disputed language is clearly susceptible to the interpretation advanced by Petitioners. *See Pennsylvania AFL–CIO.* Because it cannot be said with certainty that the law permits no relief or a remedy under the facts, I believe that the Majority's dismissal of Petitioners' petition for review is premature and improper.

Judge PELLEGRINI joins in this dissent.