888 A.2d 601

**The HOSPITAL & HEALTHSYSTEM ASSOCIATION OF PENN-SYLVANIA, Crozer–Keyston Health System, Susquehanna Health System, and the Washington Hospital, Appellants**

**v.**

**The DEPARTMENT OF PUBLIC WELFARE, Commonwealth of Pennsylvania, and Feather O. Houstoun, In Her Capacity as Secretary of Public Welfare for the Commonwealth of Pennsylvania, Appellees.**

Supreme Court of Pennsylvania.

Argued Nov. 30, 2004.

Decided Dec. 27, 2005.

---

Lisa Whitcomb Clark, Katherine Marie Kelton, Lewis R. Olshin, David Edwin Loder, Philadelphia, for Hosp. & Healthsystem Ass'n of PA, et al, appellants.

Mark H. Gallant, Philadelphia, Linda J. Cohen, for Urban Healthcare Coalition of PA, appellant amicus curiae.

Doris M. Leisch, Philadelphia, Helene Eichenwald Loux, John A. Kane, Harrisburg, for Dept. of Public Welfare, appellee.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice BAER.

This is a direct appeal from the Commonwealth Court's *en banc* Opinion and Order granting Appellees' preliminary objections and dismissing Appellants' Petition for Review in the Nature of a Complaint in Equity and Declaratory Judgment. Appellants' complaint sought to enjoin certain provisions of the General Appropriations Act of 2002 [1] (2002 GAA) as violative of Article III, Section 11 of the Pennsylvania Constitution, which mandates that a "general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools." As will be discussed in detail *infra*, Appellants asserted that because the 2002 GAA, a general appropriations bill, contained improper substantive language, it violated Article III, Section 11. The Common-

1. S.5, 186th Gen. Asscm., Reg. Sess. (Pa. 2002).

wealth Court, in granting Appellees' preliminary objections, concluded that the 2002 GAA did not contain substantive language in violation of Article III, Section 11. For the reasons that follow, we now reverse and remand.

Appellant, Hospital & Health System Association of Pennsylvania (HAP), is a hospital trade association that represents more than 250 acute care hospitals throughout Pennsylvania. Appellants, Crozer–Keystone Health System, Susquehanna Health System, and the Washington Hospital (collectively Health Systems), are not-for-profit hospitals that provide medical services to Medical Assistance (MA) recipients in southeastern, northcentral and southwestern Pennsylvania, respectively. They provide emergency services to all persons, including MA recipients, as required by the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, regardless of a patient's affiliation with a particular healthcare network or managed care organization (MCO). Health Systems are members of HAP.

Appellee, the Department of Public Welfare (DPW), is the Commonwealth agency responsible for administrating the MA program in Pennsylvania.[2] As is relevant to this proceeding, DPW is expressly required to reimburse Appellants and other providers for emergency services rendered to MA recipients. 42 U.S.C. §§ 1396dd, 1396u–2(b)(2); 62 P.S. §§ 443.1, *et. seq.* The program is comprised of two delivery systems: fee-for-service and managed care. Under the traditional fee-for-service system, health care providers enrolled in the MA program provide necessary medical services to eligible recipients and receive payment directly from DPW according to its established fee schedules. 55 Pa.Code §§ 1101.61, 1150.61. Under the managed care delivery system, called "Health Choices," DPW contracts with MCOs, which are private entities, to provide these services on a capitated basis.[3] In turn,

**2.** The MA program is organized under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.,* and the Pennsylvania Public Welfare Code 62 P.S. §§ 101, *et. seq.*

**3.** A "capitated basis" merely means that such services are provided for a flat rate based upon the number of participating individuals.

MCOs charged with delivery of services to MA recipients (MA MCOs) retain providers, who render services to MA MCO members, in accordance with a negotiated contract between the MA MCO and the provider.[4] Providers that have not entered into a contract with a specific MA MCO, whose member has received emergency services, are referred to by DPW and the MA MCOs as "out-of-network" or "non-plan" providers. Appellants, for purposes of this matter, are non-plan, out-of-network, providers.

Under Pennsylvania law, the Quality Healthcare Accountability and Protection Act, 40 P.S. §§ 991.2101–991.2193 (Act 68), regulates the activities of all "managed care plans" in the Commonwealth, including those services provided by MA MCOs to Health Choices enrollees. The scope of Act 68's mandate includes reimbursement for out-of-network emergency services provided to Health Choices enrollees.[5] Pursuant to Section 2116 of Act 68, MCOs, including MA MCOs, are required to reimburse out-of-network providers, such as Appellants, for out-of-network emergency services and pay "all reasonably necessary costs associated with the emergency services provided during the period of the emergency." 40 P.S. § 991.2116.

The controversy here stems from the General Assembly's enactment of the 2002 GAA, which appropriated funds for the 2002–2003 fiscal year. The appropriation to DPW contained in the 2002 GAA included a limitation regarding reimbursement by MA MCOs to out-of-network providers. Specifically, the 2002 GAA provided that where a provider is not under

4. In 1996, DPW introduced mandatory managed care into the MA program pursuant to a waiver under Section 1915(b) of the Social Security Act. 42 U.S.C. § 1396n(b). This section allowed states the flexibility to develop innovative and more efficient programs, such as managed care, to provide medical care to indigent people. *See Temple Univ. Hosp. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501 (Pa.Super.2003).

5. Pursuant to their agreements with DPW, MA MCOs are expressly required to comply with provisions of federal and state law, including Act 68, pertaining to the coverage and payment of medically necessary emergency services. *See* Health Choices Standard Agreement at 33, R. 211a.

contract with the MCO in which the MA recipient of its emergency services is enrolled, the provider's reimbursement is capped at DPW's fee-for-service rate for that service.[6]

Objecting to this limitation, Appellants filed a Petition in the Nature of a Complaint in Equity together with an Application for Special Relief in the Nature of a Preliminary Injunction with the Commonwealth Court on October 29, 2002. In their complaint, Appellants sought to enjoin this provision in the 2002 GAA as unconstitutional under the Pennsylvania Constitution.[7] Specifically, Appellants claimed that the 2002 GAA violates Article III, Section 11 because it improperly effects a change in substantive law on the reimbursement to providers who treat MA recipients. As noted previously, Article III, Section 11 mandates that a "general appropriation bill shall embrace *nothing* but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools." (Emphasis added). In asserting their claim, Appellants note that in *Biles v. DPW*, 44 Pa.Cmwlth. 274, 403 A.2d 1341, 1342 (1979), the Commonwealth Court set forth a three-part test for determining whether certain language in an appropriations bill is permissible incidental language or whether it is impermissible substantive language for purposes of Article III, Section 11. Specifically, the court stated that "[t]o be constitutional, the language

6. The exact language of the provision is as follows:

Whenever medical assistance recipients enrolled in the Department of Public Welfare's prepaid capitation program receive medically necessary emergency services, including, but not limited to, emergency transportation services and poststabilization inpatient hospital services, provided by noncontracting service providers, such services shall be paid for by the contractor at the payment rates adopted by the department for equivalent services provided under the department's fee-for-service program.
2002 GAA at 123–124.

7. Appellants also claimed in the complaint that the 2002 GAA violated the procedural due process clause of the Federal Constitution. The Commonwealth Court, however, sustained Appellees' preliminary objection in the nature of a demurrer to this claim and Appellants have not raised this ruling on appeal to our Court. Accordingly, the propriety of the Commonwealth Court's decision in this regard is not before us for disposition, and only Appellants' claims premised upon the Pennsylvania Constitution remain *sub judice*.

in an appropriation bill must be germane to the appropriations, must not conflict with existing law and it must not extend beyond the life of the appropriations bill itself." *Id.* In their complaint, Appellants maintained that the 2002 GAA conflicts with Act 68 and is, therefore, unconstitutional.[8]

On November 7, 2002, the Commonwealth Court heard oral argument on Appellants' request for Special Relief in the Nature of a Preliminary Injunction. Following the hearing, the court denied Appellants' request. Thereafter, Appellees filed preliminary objections to the Petition for Review seeking dismissal on the basis of lack of standing and for failure to state a claim for which relief could be granted.

On March 5, 2003, the Commonwealth Court, *en banc,* heard argument on Appellees' preliminary objections. In a published opinion, a majority of the court overruled in part and sustained in part Appellees' preliminary objections. The court initially found that Appellants had standing to challenge the default rate provision contained in the 2002 GAA. The court then granted Appellees' preliminary objection in the nature of a demurrer. Specifically, the court rejected Appellants' averment that the 2002 GAA conflicts with Act 68, and is therefore necessarily substantive rather than incidental in violation of Article III, Section 11 of the Pennsylvania Constitution. In reference to Appellants' assertion that the 2002 GAA conflicts with Act 68 because Act 68 requires that providers be reimbursed for "reasonably necessary costs," while the 2002 GAA caps an out-of-network provider's rate at DPW's default fee-for-service rate, the court found that no such conflict exists. Reading the 2002 GAA and Act 68 *in pari materia,* the court found the provisions compatible in that Act 68 requires that providers be reimbursed for "reasonably necessary costs" and the fee-for-service rate set by DPW is, by definition, a reasonable cost for the provided service. Accordingly, the court

---

**8.** Appellants base their constitutional argument solely upon the requirement in *Biles,* that to be constitutional, the subject provision in the challenged appropriations bill "must not conflict with existing law." Appellants concede that the language in the 2002 GAA is germane to the appropriations bill and that the limitation contained therein does not extend beyond the life of the appropriations bill itself.

found the contested language incidental rather than substantive and dismissed the Petition for Review. Appellants then filed the current direct appeal with our Court.

On appeal, Appellants argue that the Commonwealth Court erroneously concluded that the language at issue in the 2002 GAA is not substantive language in violation of Article III, Section 11.[9] Specifically, both parties agree that the three-part test established by the Commonwealth Court in *Biles* should apply in this context for purposes of determining whether language attached to a general appropriations bill constitutes permissible incidental language or impermissible substantive language.

■ As was the case before the Commonwealth Court, Appellants focus solely on the second prong of *Biles* and argue that because the language in the 2002 GAA conflicts with Act 68 it is necessarily substantive, in violation of Article III, Section 11 and, therefore, must be stricken as unconstitutional.[10] In response, DPW's argument mirrors its argument below, as well as the conclusion reached by the Common-

9. Appellants also assert that the 2002 GAA constitutes improper rate-setting by the legislature between private parties (MA MCOs and providers) in violation of *Common Cause of Pennsylvania v. Commonwealth*, 668 A.2d 190 (Pa.Cmwlth.1995), *aff'd*, 544 Pa. 512, 677 A.2d 1206 (Pa.1996) (enjoining the expenditure of funds appropriated by certain line items in a general appropriations bill because they provided for payment to entities not totally under the control of the Commonwealth). However, as discussed *infra*, because we conclude that the 2002 GAA conflicts with Act 68 and is, therefore, substantive in violation of Article III, Section 11, we need not address this additional assertion.

10. The Urban Heatlhcare Coalition of Pennsylvania, filed an *amicus curiae* brief in support of Appellants and, citing *Biles*, argues that, in addition to conflicting with Act 68, the disputed language in the 2002 GAA is not germane to the appropriation nor limited to the life of the act. However, as correctly asserted by DPW, *amicus* briefs may only address questions set forth by the parties. *See* Pa.R.A.P. 531, entitled "Participation by Amicus Curiae" and noting that "anyone interested in questions involved ... may ... file a brief ... in regard to those questions." Thus, these matters are not properly before us and need not be addressed. *See also Commonwealth v. Tharp*, 562 Pa. 231, 754 A.2d 1251 (2000) (noting that the Court need not address issues in brief of *amicus curiae* because appellant had not raised the issue below or before the Court).

wealth Court, namely, that the language in the 2002 GAA is permissible incidental language which meets the *Biles* test in that the language of the 2002 GAA and Act 68 do not conflict when read *in pari materia*. In the alternative, DPW argues that the court erred in denying its preliminary objection challenging Appellants' standing and, on this basis, we should affirm the order below denying Appellants relief.

Before addressing the merits of Appellants' claim, as a threshold matter, we must examine DPW's alternative claim that the Commonwealth Court erred in determining that Appellants have standing to pursue the instant claim.[11] If we were to reverse on this basis, further review of Appellant's substantive claims would be unnecessary. Thus, we turn to standing.

As this Court explained in *William Penn Parking Garage, Inc., v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975), where a person is not adversely affected in any way by the matter challenged, he is not aggrieved and thus has no standing to obtain a judicial resolution of that challenge. *Id.* at 280. This Court also noted that "it is not sufficient for the person claiming to be 'aggrieved' to assert the common interest of all citizens in procuring obedience to the law" but that in order to be aggrieved, a party must show that it has a substantial, direct and immediate interest in the claim sought to be litigated. *Id.* at 280–83. In *South Whitehall Township Police Service v. South Whitehall Township*, 521 Pa. 82, 555 A.2d 793, 795 (1989), we further explained that

11. While DPW did not appeal or cross-appeal from the Commonwealth Court's adverse ruling regarding its preliminary objection as to standing, because it was not aggrieved by the court's ultimate decision in the case sustaining its preliminary objection in the nature of a demurrer, it was not required to file such an appeal. *See* Pa.R.A.P. 501 (noting that any party who is aggrieved by an appealable order, may appeal therefrom); *see also* Pa.R.A.P. 511, Official Note (citing *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695 (Pa.Super.2000)); *Hashagen v. Workers' Comp. Appeal Bd.*, 758 A.2d 276 (Pa.Cmwlth.2000) (holding an Appellee should not be required to file a cross-appeal because the Court below ruled against it on an issue, so long as the judgment granted Appellee the relief it sought).

[a] "substantial" interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law. A "direct" interest requires a showing that the matter complained of caused harm to the party's interest. An "immediate" interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it, and is shown where the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or constitutional guarantee in question.

 As noted previously, DPW raised Appellants' alleged lack of standing before the Commonwealth Court as one of its preliminary objections to Appellants' Petition for Review.[12] Specifically, although DPW conceded before the Commonwealth Court that Appellants' interest in the challenged provision is substantial,[13] DPW questioned whether Appellants' interest was direct and immediate. Specifically, DPW argued that Appellants failed to demonstrate a direct and immediate interest because they did not allege in their Petition for Review that any of their members were harmed as a result of the disputed language in the 2002 GAA at any time since its passage, or that any out-of-network provider rendering emergency services to an MA MCO member, billed the MA MCO and was paid pursuant to the disputed provision.

The Commonwealth Court rejected this claim pointing out that the interest Appellants seek to protect is "the right . . . to negotiate with the MCO for payment for emergency services provided to MA recipients." *See Hosp. & Healthsys. Ass'n of Pa. v. DPW*, 828 A.2d 1196, 1200 (Pa.Cmwlth.2003). In find-

12. In ruling on whether preliminary objections were properly sustained, an appellate court must determine whether it is clear and free from doubt from all the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish a right to relief. *Uniontown Newspapers, Inc. v. Roberts*, 576 Pa. 231, 839 A.2d 185, 196 (2003). Such review raises a question of law as to which our standard of review is *de novo* and our scope of review is plenary. *See Buffalo Township v. Jones*, 571 Pa. 637, 813 A.2d 659, 664 n. 4 (2002).

13. The Commonwealth Court noted that DPW made such a concession in its brief filed with the court. *See Hosp. & Healthsys. Ass'n of Pa. v. DPW*, 828 A.2d 1196, 1200–01, n. 7 (Pa.Cmwlth.2003).

ing that their interest is direct and immediate, the court concluded as follows:

Here, HAP and the Health Systems assert a double bind: they must, today, treat all MA patients but they cannot negotiate for the reimbursement for those services, at least for those patients not in an MCO with which the hospital has contracted. This interference establishes the requisite causal connection required for standing.

*Id.*

■ We agree with the Commonwealth Court that Appellants have standing to challenge the questioned language in the 2002 GAA. Appellant's interest in the subject matter is neither remote nor abstract; rather, the applicable challenged language presently and directly changes the way in which they may receive payment for emergency services—services that they are statutorily obligated to provide to MA recipients. Pursuant to the 2002 GAA, they are paid according to a non-negotiated default schedule of payments. Previously, they were paid in accordance with Act 68, which specifically did not set forth a default rate of reimbursement. Accordingly, we find that they have established the causal connection between their interests and the subject language at issue in the 2002 GAA required for standing. Thus, we now turn to the merits of Appellants' claim that the questioned language is substantive and violates Article III, Section 11.[14] We begin by analyzing the history and purposes of this section.

Article III, Section 11 is one of several provisions in the Constitution detailing the legislative appropriation powers of the General Assembly. Because legislative measures setting forth appropriations are necessarily omnibus, such bills are exempted from Article III, Section 3's single subject requirement, which specifies that "[n]o bill shall be passed containing more than one subject ... except a general appropriation bill ..." Pa. Const. Art. 3, § 3. The historical interplay of these provisions and their purposes was eloquently set forth in this

14. As the matter involves resolution of a pure question of law, our scope of review is plenary. *Montgomery v. Bazaz–Sehgal,* 568 Pa. 574, 798 A.2d 742 n. 5 (2002).

Court's prior decision in *Commonwealth v. Barnett,* 199 Pa. 161, 48 A. 976, 977 (1901), as follows:

> [B]ills, popularly called 'omnibus bills,' became a crying evil, not only from the confusion and distraction of the legislative mind by the jumbling together of incongruous subjects, but still more by the facility they afforded to corrupt combinations of minorities with different interests to force the passage of bills with provisions which could never succeed if they stood on their separate merits. So common was this practice that it got a popular name, universally understood, as 'logrolling.' A still more objectionable practice grew up, of putting what is known as a 'rider' (that is, a new and unrelated enactment or provision) on the appropriation bills, and thus coercing the executive to approve obnoxious legislation, or bring the wheels of the government to a stop for want of funds. These were some of the evils which the later changes in the constitution were intended to remedy. Omnibus bills were done away with by the amendment of 1864 that no bill shall contain more than one subject, which shall be clearly expressed in the title. But this amendment excepted appropriation bills, and as to them the evil still remained. The convenience, if not the necessity, of permitting a general appropriation bill containing items so diverse as to be fairly within the description of different subjects was patent. The present constitution meets this difficulty— First, by including all bills in the prohibition of containing more than one subject, except 'general appropriation bills' (article 3, § 3); secondly, by the provision that 'the general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the executive, legislative, and judicial departments of the commonwealth, interest on the public debt, and for public schools; all other appropriations shall be made by separate bills each embracing but one subject....'

In examining this history, the Commonwealth Court aptly noted in *Common Cause of Pennsylvania v. Commonwealth,* 668 A.2d 190, 197 (Pa.Cmwlth.1995) (emphasis in original), that

It is apparent, then, that Article III, Section 11 was intended to *restrict* the power of the legislature as a trade-off for the provision in Article III, Section 3 which excludes a general appropriation bill from the single subject requirement. Because a general appropriation bill of necessity contains multiple subjects, the Article III, Section 3 exclusion was a practical necessity. However, the potential for legislative abuse was limited by requiring that such bills contain *only* appropriations. . . .

Strictly interpreted, Article III, Section 11 mandates that a general appropriations bill be nothing more than a schedule of amounts appropriated and the objects of the expenditure. Pennsylvania courts, however, have not applied Article III, Section 11 in such a literal manner. In *Commonwealth ex. rel. Greene v. Gregg,* 161 Pa. 582, 29 A. 297, 297–98 (1894), this Court considered a provision in a general appropriations act that authorized employment of a clerk in the office of the Supreme Court prothonotary and appropriated funds for the position. The *Gregg* Court upheld the provision, holding that the language in question was simply incidental to the main purpose of the appropriations act, which is "to secure the performance of the regular and ordinary work of the office." *Id.* at 298. The *Gregg* Court noted that the purpose of Article III, Section 11's limiting language was to "eliminate the practice of forcing the passage of extraneous matters, not germane to the purpose of the bill itself, that was intended to be abolished." *Id.* The Court believed the relevant inquiry centered on whether "the present measure [is] within the mischief that was intended to be prohibited." *Id.*

In concluding that the measure before it, the authorization and funding of a Supreme Court prothonotary clerk, was not within the mischief sought to be prohibited by Article III, Section 11, the Court noted that it "cannot be assumed that the constitution meant to compel the legislature even to supervise all the details of government," which would be the logical consequence if a separate enactment were required "every time an additional clerk was to be appointed in a public department." *Id.* Thus, this Court noted that "[w]hile it holds

the purse strings, [the legislature] controls the whole subject as completely as its proper functions under the constitutional demand." *Id.*

Because the measure at issue was an appropriation for the ordinary expenses of the prothonotary and the legislature had the power "to do the substantial thing that it did," the Court concluded that accomplishing "the substantial thing," by way of a general appropriations provision was not constitutionally repugnant. Again, the Court concluded that because the questioned language was incidental to the main purpose of securing the performance of the regular and ordinary work of the office of prothonotary it was not violative of Article III, Section 11.

Later, in *Biles,* the Commonwealth Court examined the constitutional propriety of a provision set forth in a supplemental appropriation to DPW, which limited the class of full-time college or university students who were eligible to receive general financial assistance payments from DPW. Specifically, the questioned language in the appropriations bill noted that after January 1, 1978, none of the monies appropriated therein could be used to pay general assistance funds to any student who had not participated in a federally subsidized program for dependent children. In rejecting a constitutional challenge pursuant to Article III, Section 11 by a class of persons considered ineligible for general assistance funds, the Commonwealth Court adopted the comprehensive three-prong test for determining whether language contained in a general appropriations bill violates Article III, Section 11. The court derived the test from an Attorney General Opinion (hereinafter "AG Opinion") that analyzed prior Attorney General Opinions and decisions from other jurisdictions in order to establish guidelines for determining what constitutes substantive, and therefore unconstitutional, language in an appropriations act.[15]

15. The AG Opinion is set forth at 1978 Op. Att'y Gen. Pa. 56 (Sept. 1978)

The first prong of the test requires that the questioned provision be germane to the appropriation. A close examination of *Biles* and the AG Opinion reveals that this prong is clearly derived from our prior decision in *Gregg* and our observation there that it was the practice of "logrolling" extraneous matters not germane to the purpose of an appropriations bill itself that Article III, Section 11 intended to abolish.

The second prong of the test requires that the provision not conflict with existing legislation. The AG Opinion noted that in other jurisdictions language contained in appropriations bills was struck where it conflicted with other legislative enactments. In particular, the AG Opinion referenced the Washington State Supreme Court's decision in *Flanders v. Morris*, 88 Wash.2d 183, 558 P.2d 769 (1977), wherein the court struck down a provision in a general appropriations law that prevented single people under fifty years of age from collecting public assistance because it conflicted with an already existing general law. Finding that the provision was actually an amendment to the existing public assistance law, the court decided that "the proper legislative procedure is to enact separate, independent, properly titled legislation," rather than to insert it into an appropriations measure. *Id.* at 773. Thus, the AG Opinion noted that "if a provision amends or repeals an already existing law, it is substantive and must follow the correct procedure for amendments." AG Opinion at 4 (citing, Sands, 1A, SUTHERLAND STATUTORY CONSTRUCTION § 22.16).[16]

The final prong of *Biles* requires that the particular measure at issue not extend beyond the life of the appropriations bill itself. Again, the AG Opinion, in including this prong sought to eliminate the possibility that the legislature could establish, generally, new programs or requirements through the enactment of an appropriations bill rather than by proper-

16. The AG Opinion also indicates that in five previous Attorney General Opinions, language was found to be violative of Article III, Section 11 on the basis that it conflicted with other laws. *See Id.* (citing, Op. Att'y Gen. Pa. 237 (1961); Op. Att'y Gen. Pa. 101 (1958); Op. Att'y Gen. Pa. 16 (1957); Op. Att'y Gen. Pa. 12 (1957); Att'y Gen. Pa. 81 (1933)).

ly enacting such measures through separate bills with the purpose clearly expressed in their titles as required by Article III, Section 3. Thus, the AG Opinion concluded that enactments in appropriation provisions which attempt to achieve permanency are substantive because appropriation provisions, by their nature, are temporary.

In applying this test to the facts in *Biles*, as noted, the court ultimately upheld the questioned limitation set forth in the appropriation. The court concluded that the limitation, or directive on the manner of spending, was germane to the appropriated public assistance funds, did not conflict with any other existing legislation, and did not extend further than the life of the appropriation itself.

Turning to the matter before us, as noted, both parties advocate our adoption of the *Biles* test as the appropriate inquiry of the matter at bar for purposes of Article III, Section 11. While each argues variant results in applying the test, both agree that the test is well-reasoned and thorough. As the parties do not dispute whether the *Biles* test should govern, and, as we agree that the test is comprehensive and well-reasoned, we now adopt it as the appropriate framework for analyzing whether particular language in an appropriations act constitutes improper substantive language in violation of Article III, Section 11.[17] Here, the dispute centers on prong two of the test and whether the language contained in the 2002 GAA conflicts with Act 68.

**17.** This Court has made reference to the *Biles* test, without formally adopting it, on a prior occasion, *see Adams County, et al. v. DPW*, 502 Pa. 47, 463 A.2d 1002 (1983) (referencing the Commonwealth Court's application of *Biles* in analyzing a proviso contained in a general appropriations act, which stated that payments made by DPW pursuant to a particular statutory provision shall not exceed the amount of state funds appropriated and concluding, contrary to the Commonwealth Court, that such proviso did not conflict with the statutory provision at issue, but, rather, merely stated the truism that DPW was limited to reimbursement based upon the monies appropriated to it by the legislature). Further, we have affirmed, without opinion, decisions of the Commonwealth Court that applied *Biles*. *See Wesbury United Methodist Community v. DPW*, 142 Pa.Cmwlth. 353, 597 A.2d 271 (1991), *aff'd* 533 Pa. 85, 619 A.2d 1057 (1993) and *Cedarbrook Nursing Homes v. Department of Public Welfare*, 154 Pa.Cmwlth. 1, 622 A.2d 401 (1991), *aff'd*, 533 Pa. 307, 622 A.2d 282 (1993).

As noted previously, this prong is directed at preventing the legislature from altering existing legislation through an appropriations act as opposed to accomplishing such an amendment through the normal legislative course. In this regard, Appellants rely on the Commonwealth Court's prior cases of *Wesbury United Methodist Community v. DPW*, 142 Pa.Cmwlth. 353, 597 A.2d 271 (1991), *aff'd* 533 Pa. 85, 619 A.2d 1057 (1993), and *Cedarbrook Nursing Homes v. DPW*, 154 Pa.Cmwlth. 1, 622 A.2d 401 (1991), *aff'd*, 533 Pa. 307, 622 A.2d 282 (1993), where the Commonwealth Court invalidated language in appropriations to DPW on the grounds that the language in each case went beyond a monetary appropriation and conflicted with existing law.

Specifically, in *Wesbury*, pursuant to its regulatory authority, DPW established the starting date for certain medical assistance payments authorized by the Public Welfare Code. Subsequently, in separate legislation appropriating funds to support these medical assistance payments, the General Assembly inserted language into the appropriation that changed the payment starting date established by DPW. The Commonwealth Court held that the change of the payment starting date overlooked the regulatory authority of DPW, and thus was in effect an amendment to the Public Welfare Code that went beyond a monetary appropriation in violation of Article III, Section 11. The court stated:

The General Assembly properly exercised its authority to appropriate specific funds to DPW for the purpose of supporting medical assistance payments. However, because the legislature has delegated the relevant rate-establishing authority to DPW, the legislature's attempt, in the appropriations act, to establish a new starting date for a rate change went beyond a monetary appropriation, thus violating the proviso within [Article III, Section 11] that "[the] general appropriation bill shall embrace nothing but appropriations ..." That attempted change of one aspect of the previous statutory delegation of rate-making power was truly a purported amendment of section 443.1(3) of the Public Welfare Code, which was not an appropriation.

*Wesbury,* 597 A.2d at 273. In *Cedarbrook,* the court, ruling on facts and issues identical to *Wesbury,* stated that "we held that the starting date in the appropriations act was substantive and therefore unconstitutional." *Cedarbrook,* 622 A.2d at 403.

Appellants here argue that like the starting date provisions in *Wesbury* and *Cedarbrook,* the disputed language in the 2002 GAA clearly effected a substantive change to Act 68 in violation of Article III, Section 11. Specifically, they contend that the language in the 2002 GAA, like the language inserted into the appropriation to DPW in *Wesbury,* constituted an improper amendment of existing legislation, Act 68, and, as such, was substantive. Along these lines, Appellants further argue that the Commonwealth Court's *in pari materia* reading of the 2002 GAA and Act 68 ignored obvious conflicts between the two provisions that were not properly resolved, such as the fact that Act 68 expressly provides that MA MCOs do not operate under DPW's fee-for-service program.

Additionally, Appellants claim that as in *Wesbury* and *Cedarbrook,* where the court concluded that the language in the general appropriations acts resulted in a change in the existing regulatory authority, so too does the disputed language in the 2002 GAA. Specifically, Appellants point out that pursuant to Act 68, the Department of Health (DOH) and the Pennsylvania Insurance Department (PID) have regulatory authority in relation to its provisions. Appellants argue that the 2002 GAA overlooked such authority as it relates to the reimbursement of emergency services under Act 68 because the 2002 GAA requires that providers be reimbursed at DPW's default reimbursement rate, a provision that was not sanctioned by the regulatory authority of DOH and PID. In fact, Appellants note both DOH and PID, in accordance with their authority delegated under Act 68, excluded fee-for-service plans from the definition of "managed care plan" in the Act 68 implementing regulations. *See* 28 Pa.Code § 9.602; 31 Pa.Code 154.2. Thus, Appellants maintain that, as in *Wesbury* and *Cedarbrook,* where the court held that the usurpation of DPW's regulatory authority in a general appropriations bill violated

Article III, Section 11, here too the usurpation of DOH's and PID's regulatory authority should lead to the conclusion that the 2002 GAA violates Article III, Section 11.

In response to Appellants' claims, Appellees argue that in adopting the 2002 GAA the General Assembly acted within the constraints imposed by Article III, Section 11 of the Pennsylvania Constitution. Appellees maintain that the language in the 2002 GAA and Act 68 does not conflict and thus violate the *Biles* test for purposes of Article III, Section 11. In this regard, Appellees first note that no provision of Act 68 compels the "negotiation of rates" between out-of-network providers and MA MCOs. To the contrary, the statute applies generally to all hospitals and to all MCO's, MA and non-MA, requiring the hospitals to render emergency medical care without having to seek or receive authorization and the MCOs to pay for that care. Appellees continue that Act 68 merely assures that, when a hospital enrolled in the MA program delivers emergency services to an MA recipient enrolled in an MA MCO with which the hospital has no contract, the amount that the hospital would otherwise be paid under the MA fee-for-service program for the same service, to the same recipient, will be the amount the MA MCO must pay the hospital under the default rates of the 2002 GAA.

Appellees reiterate the holding of the Commonwealth Court that the disputed language in the 2002 GAA and Act 68 can, and therefore, must, be read in harmony. Specifically, Appellees claim that, as the Commonwealth Court found, Act 68 requires that providers be reimbursed for "reasonably necessary costs" and that the fee-for-service rate specified in the 2002 GAA is, by definition, a reasonable cost for the provided services. In support of their position, Appellees rely on the Commonwealth Court's prior decision in *Hahnemann University v. DPW*, 128 Pa.Cmwlth. 605, 564 A.2d 521 (1989), where the court held that DPW's pre-fixed method for calculating reimbursement for in-patient hospital services based upon an efficient and economically operated hospital was proper and in accordance with a legislative directive that DPW formulate regulations calculating reasonable costs for such services.

Finally, in response to Appellants' regulatory authority argument, Appellees note that the DOH in adopting regulations implementing Act 68 determined that it does not have sufficient authority under Act 68 to require non-contracting providers, such as Appellants, to accept plan reimbursement rates as payment in full. Given this declaration, Appellees argue that there is no "regulatory authority" for the 2002 GAA to "eliminate."

We agree with Appellants that the language set forth in the 2002 GAA constituted an improper attempt by the legislature to amend Act 68 in violation of the second prong of the *Biles* test and, accordingly, that it constituted invalid substantive language in violation of Article III, Section 11. We view the legislature's attempt to impose DPW's fee-for-service default rate as the rate non-plan providers such as Appellants *must* accept for emergency services as an effort by the legislature to suspended Act 68's requirement that providers be paid "all reasonably necessary costs" for the period of time covered by the 2002 GAA. As asserted by Appellants, prior to the 2002 GAA, out-of-network providers could negotiate with MA MCOs for "reasonably necessary costs" associated with emergency services pursuant to Act 68 as the legislature failed to impose specific reimbursement rates for these services. After the passage of the 2002 GAA, these costs were capped at DPW's fee-for-services rate. Thus, unquestionably, the amount Appellants could receive for out-of-network services to MA MCO members was subject to change because prior to the passage of the 2002 GAA out-of-network providers were not limited in negotiating for these services. In other words, out-of-network providers could receive *all* reasonably necessary costs for a given service, even if such cost exceeded DPW's fee-for-service reimbursement rate. After the passage of the 2002 GAA, they could not.

Further, we reject Appellees contention that nothing in Act 68 established a right on the part of Appellants to negotiate for "reasonably necessary costs." While Act 68 does not explicitly specify that MA MCOs and out-of-network providers are to negotiate over what constitutes "reasonably necessary

costs" for emergency services, in the absence of setting forth a specific rate for these services, we believe that such right is implicit in the legislation as drafted. Clearly, the legislation, in failing to impose non-negotiated rates, evince the reasoned policy of the legislature that the parties, the MCOs and the providers, are in the best position to determine reasonably necessary costs on a case by case basis in the absence of a contract. In fact, Act 68 expressly specifies that all MCOs, including MA MCOs, do not operate under DPW's fee for service program. In this regard, Section 2192 of Act 68 entitled, "Exceptions", states, in relevant part:

This article shall not apply to any of the following:

\* \* \*

(4) The fee-for-services programs operated by the Department of Public Welfare under Title XIX of the Social Security Act.

40 P.S. § 991.2192.

Moreover, we do not view it as self-evident that DPW's fee-for-service rate imposed by the 2002 GAA necessarily equates with the "reasonably necessary costs" mandated by Act 68. In fact, Appellants aver that implementation of the 2002 GAA will result in savings of $50 million. Thus, it appears, that the legislative motive in imposing the subject restriction in the 2002 GAA was to pass on cost savings to MA MCOs in the payment of funds to out-of-network providers for emergency services, providers to whom all reasonably necessary costs were due prior to the passage of the 2002 GAA, and providers who are obligated to provide the subject services.

The Superior Court recently rejected a similar assertion in *Temple University Hospital, Inc., v. Healthcare Management Alternatives, Inc.,* 832 A.2d 501 (Pa.Super.2003). There, the court addressed the issue of what constitutes the "reasonable" value of services provided to MA managed care enrollees in the absence of a contract between a hospital and an MA MCO. In rejecting the MA MCO's argument that DPW's fee-for-service rates necessarily establish the reasonable value of the services at issue, the court noted that according to the MA

MCO's own expert, such rates are significantly lower than the actual costs of providing such services.[18] Thus, applying principles of equity, the court held that the reasonable value for the subject services is the value paid by the relevant community—the relevant community being hospital patients who are covered by insurance policies and federal programs. The court ultimately concluded that the hospital should be awarded the average charge for the services at issue contained in contracts with governmental agencies and insurance companies. The court's decision rested on the fact that, because the hospital was required, under federal law, to treat MA MCO enrollees, and the MA MCO could not prevent its enrollees from seeking treatment at the hospital, neither party should receive a windfall for the services provided in the absence of a contract.

Although *Temple* did not specifically involve application of Act 68, we find significant the court's rejection of the assertion that DPW's default fee-for-service rates necessarily equal reasonable costs for the provision of hospital services in the absence of a specific directive. As in this case, the provider in *Temple* was obligated to provide services to MA MCO enrollees and, in the absence of a contracted-for rate for these services, the court concluded that equity required that the provider be paid the average actual cost for the services. These costs, the court concluded, were neither represented by DPW's default rates or the provider's published rates, but fell somewhere in between the two.

On this point, Appellees find the Commonwealth Court's prior decision in *Hahnemann v. DPW*, 128 Pa.Cmwlth. 605, 564 A.2d 521 (Pa.Cmwlth.1989), more persuasive. We disagree. In *Hahnemann*, the issue was whether a change in DPW's methodology for calculating in-patient reimbursement rates under its fee-for-service program conflicted with the

---

18. The exact testimony cited by the court reflected the experts testimony that DPW fee-for-services covered only eighty to eighty-three percent of the costs incurred by hospitals that treat indigent patients. *See Id.* at 507. The court, likewise, rejected the provider's demand for payment of its published rates, which the court found were consistently above the average actual cost for such services.

Public Welfare Code, which required DPW to pay the "reasonable costs" of inpatient services. The prior system calculated reimbursement based upon the actual cost associated with a service, whereas the new calculation method set forth rates based upon the cost an efficient and economically operated hospital would charge.

The court concluded that the new reimbursement method was proper and that DPW's setting of rates in this manner could be harmonized with the Public Welfare Code requiring DPW to pay reasonable costs for inpatient services because the Code expressly directed DPW to determine "reasonable costs" by way of its own regulations. Specifically, the court concluded that "[w]hile . . . the Public Welfare Code provides for the payment of reasonable costs of in-patient care, it also provides that such reasonable costs *are to be as 'specified in the Department's regulation.'*" *Id.* at 608, 564 A.2d 521 (emphasis added). Thus, the Code itself expressly permitted the subsequent rate change made by DPW.

Here, no such assertion can be made. Act 68, which was enacted after *Hahnemann* was decided, does not refer to any DPW rate schedules or regulations mandating the amount MCOs must pay providers. Nor does Act 68 specify that DPW can impose such a rate. In fact, Act 68 expressly excludes the fee-for-services schedule from its scope. *See* 40 P.S. 991.2102(4) (specifying that the term "managed care plan" does not include ancillary service plans or indemnity arrangements which are fee-for-service). Likewise, the implementing regulations of both the DOH and PID, the regulatory entities charged with implementing the requirements of Act 68, exclude fee-for-service plans from the definition of managed care. *See* 28 Pa.Code § 9.602 (noting, in the DOH regulations implementing Act 68, that the term "managed care plan" does not include "fee for service" plans); *see also* 31 Pa.Code § 154.2 (PID regulations noting the same). Moreover, the DOH and PID have regulatory authority in this regard. However, they have expressly declined to impose default rates for reasonably necessary costs based upon the legislature's very clear indication in Act 68 that default rates do not apply thereunder. *See* 31 Pa. Bull. 3043, 3070 (June 9, 2001) (where-

in the DOH explains that it does "not have sufficient authority under Act 68 to require noncontracted providers to accept plan reimbursement rates as payment in full").

■ Based on the foregoing, we conclude that the 2002 GAA and Act 68 irreconcilably conflict and, therefore, hold that the legislature's attempt to alter Act 68 by imposing a default rate through the enactment of the 2002 GAA was constitutionally violative of Article III, Section 11. While we must give due deference to the legislature, a co-equal branch of government, when acting in its capacity to enact the laws of the Commonwealth, we will only do so where it observes constitutional constraints. *See Consumer Party v. Commonwealth*, 510 Pa. 158, 507 A.2d 323, 333 (1986). We have indicated in this regard that it would be "a serious dereliction on our part to deliberately ignore a clear constitutional violation." *Id.* Accordingly, while the legislature certainly had the authority to alter Act 68 in conformance with the condition set forth in the 2002 GAA, we believe the proper way to do so would have been through a separate enactment for the legislature's full and focused consideration pursuant to the requirements of the Constitution. By placing this substantive amendment in the 2002 GAA, the legislature violated Article III, Section 11. This is just the type of substantive extraneous matter that Article III, Section 11's mandate was designed to eliminate.

Accordingly, we find the Commonwealth Court erred in concluding that the 2002 GAA and Act 68 do not conflict for purposes of Article III, Section 11. Further, we conclude that the court erroneously granted Appellees' preliminary objection in the nature of a demurrer. Thus, the order of the Commonwealth Court is reversed and the matter is remanded for further proceedings consistent herewith.

Chief Justice CAPPY, Justices CASTILLE and NIGRO, NEWMAN, SAYLOR and EAKIN join the opinion.