UNIONTOWN HOSPITAL, Jameson Memorial Hospital, Somerset Hospital, and Monongahela Valley Hospital, Petitioners

v.

COMMONWEALTH of Pennsylvania DEPARTMENT OF HEALTH; Calvin B. Johnson, MD, MPH, Secretary of Health; Richard H. Lee, Deputy Secretary for Quality Assurance, Respondents.

Commonwealth Court of Pennsylvania.

Argued March 14, 2006.

Decided April 3, 2006.

Ordered Published Aug. 9, 2006.

Linda J. Shorey, Harrisburg, for petitioners.

Mark A. Aronchick, Philadelphia, for respondents.

OPINION BY Judge PELLEGRINI.

Before this Court are preliminary objections or, in the alternative, an application for summary relief filed by the Commonwealth of Pennsylvania, Department of Health, *et al*,[1] (collectively, the Department) in response to a petition for review in the nature of an action in mandamus along with an expedited application for summary relief filed by Uniontown Hospital, Jameson Memorial Hospital, Somerset Hospital and Monongahela Valley Hospital (collectively, the Hospitals).

On January 25, 2006, the Hospitals filed a petition for review in the nature of an action in mandamus requesting this Court to issue a writ of mandamus ordering the

Department to comply with Section 215 of Act No. 2005–1A, also known as the 2005 General Appropriation Bill. That section provides:

> For Quality Assurance. A portion of this appropriation shall be used for the negotiation of criteria for renewal or permanent approval of the services provided under the angioplasty[2] demonstration project and *no change in the criteria as initially approved under the demonstration shall occur absent regulations or agreement by the hospitals participating in the demonstration project.* State appropriation ... $16,057,000. (Emphasis added.)

The 'demonstration project' came about as a result of the following:

The Hospitals, which did not have on-site open heart surgery services, indicated an interest in providing angioplasty services at their facilities.[3] Because only hospitals with on-site open heart surgery services are permitted to perform angioplasties pursuant to 28 Pa.Code § 138.15, the Department suggested the Hospitals submit requests for exceptions pursuant to 28 Pa.Code §§ 51.31–51.33. The Hospitals made their submissions, which were all denied by the Department. The Hospitals appealed the denials to the Secretary of Health who informed them that in settlement of their appeals, the Department was willing to grant them exceptions to provide angioplasties under a "demonstra-

---

1. The other parties are Calvin B. Johnson, M.D., MPH, Secretary of Health and Richard H. Lee, Deputy Secretary of Health for Quality Assurance.

2. "Angioplasty is the common name for percutaneous transluminal coronary angioplasty ('PTCA'), which is defined under the Department's hospital regulations as a 'procedure which uses a balloon catheter, plaque removing device, laser device or mechanical stent to

re-open collapsed, blocked or partially blocked arteries.' 28 Pa.Code § 138.2." (Petition for Review at paragraph 9.)

3. The request was made on the basis that the residents in the Hospitals' service areas had difficulty obtaining angioplasty procedures due to travel distances to other facilities with open heart surgical services.

tion project" with specified criteria.[4] The Hospitals agreed to the criteria, and each was granted an exception and allowed to perform angioplasties as part of a demonstration project to be evaluated at the end of two years. The Hospitals began offering angioplasty services in January 2002 (Uniontown), December 2002 (Somerset), January 2003 (Monongahela Valley) and February 2004 (Jameson). The demonstration project's initial two-year period for each of the Hospitals ended on December 6, 2004 (Somerset), January 7, 2005 (Uniontown), January 17, 2005 (Monongahela Valley), and February 17, 2006 (Jameson). The Department has allowed the Hospitals to continue to operate the demonstration project even though their initial two-year period has expired.

The petition for review alleges that the Department chose to continue the exceptions, but unilaterally changed the criteria. Specifically, it alleges that on June 14, 2005, the Department sent the Hospitals a letter stating the following:

All hospitals who have already reached the completion of the two-year demonstration period or who will reach that

completion date by March 2006 are required to participate in the (Cardiovascular Patient Outcomes Research Team) CPORT study for elective (Percutaneous Coronary Intervention) PCI [angioplasty] in order to maintain their exception permitting them to provide elective PCI. Those hospitals whose demonstration projects terminate after March 2006 are strongly encouraged to enroll in the upcoming CPORT study.[5]

Upon receiving this letter, the Hospitals expressed concerns and proposed extensions of the demonstration project. The Department declined to negotiate until the Hospitals agreed to enroll in the CPORT study. The petition further alleges that after the enactment of Section 215 of Act No. 2005-1A, the Hospitals made a written demand that the Department comply with Section 215 and either negotiate with the Hospitals participating in the demonstration project or promulgate regulations to govern the performance of angioplasty in hospitals that did not provide open heart surgery services. The Department responded by informing the Hospitals that

4. Under the terms of the demonstration project, the Hospitals were permitted to provide emergent and elective PCI procedures upon entering into an agreement with the Department under which the Hospitals agreed to: follow guidelines issued by the American College of Cardiology for the performance of PCI procedures, seek training and monitoring by a tertiary hospital that currently provides open heart surgical services, report all transfers of PCI patients to the Department, provide notification to its liability insurance carrier that it is providing primary and elective PCI services without the availability of on-site open heart surgical services, disclose information regarding the demonstration project to prospective PCI patients in a consent form, enroll in the American College of Cardiology—National Cardiovascular Data Registry, and provide all required data to that organization regarding performance of the PCI procedures. (35 Pa. B. 2964 at 1–2 (2005)).

5. This letter was the result of a study by the Legislative Budget and Finance Committee on open heart surgery regarding the risks associated with performing angioplasties in facilities without on-site open heart surgical programs as well as the performance of hospitals participating in the demonstration project. The Committee issued a report finding that a significant number of hospitals in the demonstration project had mortality rates that exceeded the national rates and the data collection component of the demonstration project was insufficient. The Committee recommended that the Department place a moratorium on adding hospitals to the demonstration project and then require all hospitals in the demonstration project to join a national clinical trial (CPORT) and comply with all requirements in that clinical trial. The Department apparently chose to implement the recommendations of the Committee.

for those Hospitals not choosing to participate in the CPORT study, their participation in the demonstration project would expire on March 30, 2006.

The Hospitals filed their petition for review in the nature of an action in mandamus requesting us to order the Department to comply with Section 215. They contend that the Department has a mandatory, non-discretionary duty to use money as specified in the statute appropriating the funds—meaning that the Department must comply with the qualifiers in the definition of the appropriation for quality assurance in Section 215 of the Act, and the Department has no discretion to unilaterally change the criteria for the angio-

plasty demonstration project to which the Department and the Hospitals agreed in settling the Hospitals' appeals.[6] They contend that mandamus is appropriate because they have a clear right to relief and they have no other remedy. They also contend that the language in the Act is constitutional.

▮▮▮ In response, the Department has filed a preliminary objection[7] alleging that the substantive language in Section 215 of the 2005 General Appropriation Bill is unconstitutional because it violates Article III, Section 11 of the Pennsylvania Constitution.[8] It contends Article III, Section 11 of the Pennsylvania Constitution[9] provides

6. They have also filed an expedited application for summary relief pursuant to Pa. R.A.P. 1532(b) arguing that "because of the impending end of the fiscal year on June 30, 2006, the Department's refusal to comply with Act No. 2005–1A, the length of the normal litigation process, even where no facts are in dispute, and the time that may be needed for negotiations or to start the regulation process, the Hospitals seek expedited review of this application." (Expedited Application for Summary Relief at 13.)

7. Preliminary objections should be sustained only in cases where it is clear and free from doubt that the facts pled are legally insufficient to establish a right to relief. *Werner v. Zazyczny*, 545 Pa. 570, 681 A.2d 1331 (1996).

8. The Department has also filed a preliminary objection alleging that mandamus cannot be used to compel the performance by public officials of non-ministerial discretionary obligations. The Department has filed a cross-application for summary relief in the alternative.

9. Art. 3, § 11 of the Pa. Const. provides:

The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.

*In Hospital & Healthsystem Association of Pennsylvania v. Department of Public Welfare*,

585 Pa. 106, 117, 888 A.2d 601, 608 (2005), our Supreme Court explained the purpose behind the adoption of this provision:

Article III, Section 11 is one of several provisions in the Constitution detailing the legislative appropriation powers of the General Assembly. Because legislative measures setting forth appropriations are necessarily omnibus, such bills are exempted from Article III, Section 3's single subject requirement, which specifies that "[n]o bill shall be passed containing more than one subject ... except a general appropriation bill ..." Pa. Const. Art. 3, § 3. The historical interplay of these provisions and their purposes was eloquently set forth in this Court's prior decision in *Commonwealth v. Barnett*, 199 Pa. 161, 48 A. 976, 977 (1901), as follows:

[B]ills, popularly called 'omnibus bills,' became a crying evil, not only from the confusion and distraction of the legislative mind by the jumbling together of incongruous subjects, but still more by the facility they afforded to corrupt combinations of minorities with different interests to force the passage of bills with provisions which could never succeed if they stood on their separate merits. So common was this practice that it got a popular name, universally understood, as 'logrolling.' A still more objectionable practice grew up, of putting what is known as a 'rider' (that is, a new and unrelated enactment or provision) on the appropriation bills, and thus coercing the executive to approve obnoxious legislation,

that a general appropriation act may contain only "appropriations for the executive, legislative, and judicial departments of the Commonwealth, for the public debt and for public schools," and stresses that Article III, Section 11 strictly limits what may be included in a general appropriation act. This Court has held that to be constitutional, a provision in an appropriation bill must satisfy a three-part test: 1) it must be germane to an appropriation; 2) it must not conflict with existing legislation; and 3) it must not extend beyond the life of the appropriations act. *Biles v. Department of Public Welfare*, 44 Pa.Cmwlth. 274, 403 A.2d 1341 (1979).[10] To be germane to an appropriation is to allocate funds to secure the performance of the regular and ordinary work of designated departments. *See Hospital & Healthsystem.* If the provision fails any one of these three parts, it is not properly included in the general appropriation act.

The Hospitals contend that the language of the definition of the appropriation for quality assurance in Section 215 imposes a condition requiring that a "portion of this appropriation" be used in connection with the angioplasty demonstration project that is overseen by the Division of Acute and Ambulatory Care. Because this condition is related to the general operations of the Department in the conduct of its quality assurance programs, it is germane. The Hospitals further argue that "the critical inquiry is not whether language defining an appropriation is germane to the purpose of an appropriation [but] whether the language is germane to the appropriation that it defines." (Petitioners' Brief in Opposition to Respondents' Preliminary Objections at 7.) Essentially, the Hospitals believe that as long as some money is spent to comply with the mandate, the Legislative Directive is germane to the appropriation. We disagree.

For language to be germane, it must be "incidental" to that appropriation, shape or define it in some way, and not affirmatively require the Department to act or not act within the scope of that appropriation. As the Department correctly explains:

[A]n appropriation act is a vehicle for allocating money to government departments to enable them to conduct their operations—not for legislatively micromanaging the operation of those departments by dictating substantive procedures the departments must follow in

---

or bring the wheels of the government to a stop for want of funds. These were some of the evils which the later changes in the constitution were intended to remedy. Omnibus bills were done away with by the amendment of 1864 that no bill shall contain more than one subject, which shall be clearly expressed in the title. But this amendment excepted appropriation bills, and as to them the evil still remained. The convenience, if not the necessity, of permitting a general appropriation bill containing items so diverse as to be fairly within the description of different subjects was patent. The present constitution meets this difficulty—First, by including all bills in the prohibition of containing more than one subject, except 'general appropriation bills' (article 3, § 3); secondly, by the provision that 'the general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the executive, legislative, and judicial departments of the commonwealth, interest on the public debt, and for public schools; all other appropriations shall be made by separate bills each embracing but one subject....'

**10.** It is interesting to note that the 1978 Attorney General's Opinion from which the *Biles* test was adopted went on to state that "[t]hese guidelines will not accomplish the task of interpretation in every instance, but they do provide a starting point. The ultimate test, of course, is a determination of whether the provision in question represents the type of mischief the single subject rule was meant to prevent." (1978 Op. Att'y Gen. Pa. 56 (Sept. 1978)).

spending their general operating funds. Yet that is precisely what the General Assembly attempted to do here: The Legislative Directive purports to override [the Department's] discretionary determination concerning whether and on what terms to grant the Hospitals an exception from the CSS Regulations. (Respondents' Brief in Support of their Preliminary Objections at 19.) The purpose of an appropriation act is not to specifically set aside funds for certain projects. Clearly, by stating in Section 215 that a portion of the appropriation shall be used for the "negotiation of criteria under the angioplasty demonstration project," that Legislative Directive is not allocating funds to secure the performance of the regular and ordinary work of a designated department. *Hospital & Healthsystem Association.* Instead, it is specifically allocating funds for a special project which is not the intent of an appropriations act and is not what makes it constitutional. Because the legislative mandate to spend the funds in a specific manner violates the constitution, it is improperly included in the appropriations bill.

Because the appropriations bill in this case attempts to compel the Department to undertake certain actions in a particular way, and in doing so it is not allocating funds to "secure the performance of the regular and ordinary work of designated departments," the language in Section 215 is not germane to the appropriation and is unconstitutional.

Regarding the second prong of the *Biles* test—that the appropriation must not conflict with existing legislation—the Hospitals allege that there is no existing legislation that governs the criteria for the demonstration project, the manner by which the Department creates the criteria, or the manner by which the Department can revoke or change that criteria; and, therefore, there is no conflict with existing legislation. The Department disagrees, arguing that the Health Care Facilities Act[11] provides a statutory framework to "protect and promote the public health and welfare through the establishment and enforcement of regulations setting minimum standards in the operation of health care facilities that assures the safe, adequate and efficient facilities and services and to promote the health, safety and adequate care of the patients or residents of such facilities." Further, pursuant to Sections 201 and 803 of the Health Care Facilities Act, the Department has exclusive jurisdiction over health care providers to ensure that all provisions of the Act are implemented and enforced.

Although the Hospitals argue that the conditioning language does not conflict with the Health Care Facilities Act because it says nothing about the types of procedures to be conducted in any medical facility and does not change the criteria as initially approved under the demonstration project, it clearly attempts to constrain the Department's ability to enforce the Health Care Facilities Act and implement regulations under Title 28 (*see e.g.*, 28 Pa.Code § 138.15, which provides that a hospital may only perform angioplasty services if it has an on-site open heart surgical program). By using the specific language in Section 215, it requires the Department to allow certain types of medical procedures in certain types of medical facilities for an indefinite amount of time. This conflicts with the existing legislation under the Health Care Facilities Act which gives the Department exclusive jurisdiction over health care providers and violates the second prong of the *Biles* test.

11. Act of July 19, 1979, P.L. 130, 35 P.S. §§ 448.101–448.904b.

Regarding the third prong of the test—whether the provision in the appropriation bill extends beyond the life of the 2005 General Appropriations Act, the Hospitals argue that it does not because Section 104(a) of Act 1A provides that appropriations from the general fund expire at the end of the fiscal year, i.e., appropriations in the general fund are for activities "necessary for the proper conduct of the duties, functions and activities and for the purposes hereinafter set forth *for the fiscal year beginning July 1, 2005.*" (Emphasis in original.) The Department counters by pointing out that the language itself in Section 215 indicates that it will continue indefinitely because it states that "A portion of this appropriation shall be used for the negotiation of criteria for renewal *or permanent approval* of the services provided under the angioplasty demonstration project." The Department states that if every provision in an appropriation act were necessarily deemed to expire upon the close of the fiscal year as the Hospitals argue, there would be no need for this prong of the test. We agree.

This third requirement in *Biles* is necessary to act as a check against the General Assembly to prevent it from establishing "new programs or requirements through the enactment of an appropriations bill rather than by properly enacting such measures through separate bills with the purpose clearly expressed in their titles as required by Article III, Section 3. Thus, the AG Opinion concluded that enactments in appropriation provisions which attempt to achieve permanency are substantive because appropriation provisions, by their nature, are temporary. *Hospital & Healthsystem*, 585 Pa. 106, at 120–122, 888 A.2d at 610–611. Because the General Assembly in this case sought to establish new requirements for the Department by mandating the renewal or permanent approval of the Hospitals' exceptions, that directive violated the third prong of the *Biles* test—that each provision in a general appropriation act be limited to the life of the act.

Consequently, because that language in Section 215 of the Appropriations Act is unconstitutional, we need not address the mandamus argument. Accordingly, the Department's preliminary objections are granted and the Hospitals' petition for review in the nature of mandamus is denied.[12]

### ORDER

AND NOW, this *3rd* day of April, 2006, it is hereby ordered that the preliminary objections filed by the Respondents are granted and the petition for review in the nature of an action in mandamus filed by the Petitioners is denied. The application for summary relief filed by Petitioners and the cross-application for summary relief filed by the Respondents are denied. Respondent shall take no action to stop Petitioner Hospitals from participation in the demonstration project for forty-five (45) days from the date of this order.

---

**12.** Based on how we have decided this case, the Hospitals' expedited application for summary relief and the Department's cross-application for summary relief are denied as moot.